ARKANSAS WILDLIFE FEDERATION,
Plaintiff,

v.

BEKAERT CORPORATION, Defendant.

Civ. No. 91–2203.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

April 13, 1992.

Samuel E. Ledbetter, Nichols, Wolff & Ledbetter, Little Rock, Ark., James M. Hecker, Trial Lawyers for Public Justice, Washington, D.C., for plaintiff.

Randolph C. Jackson, Jones, Gilbreath, Jackson & Moll, Paul L. Giuffre, Fort Smith, Ark., for defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This action is a citizen suit brought by the Arkansas Wildlife Federation, a not-for-profit corporation, on behalf of its members against Bekaert Corporation pursuant to section 505 of the Federal Water Pollution Control Act, hereinafter the Clean Water Act, 33 U.S.C. § 1365. Plaintiff seeks a declaratory judgment, injunctive relief, and the imposition of civil penalties.

Plaintiff has alleged a series of repeated violations of the effluent limitations of the defendant's National Pollutant Discharge

Elimination System (NPDES) permit. 33 U.S.C. § 1311(a). In addition to the discharge violations plaintiff has alleged violations of the monitoring and reporting requirements of the NPDES permit. 33 U.S.C. §§ 1318(a), 1342.

The allegations of the complaint concern the defendant's facility located in Van Buren, Arkansas. The Van Buren facility has a NPDES permit allowing it to discharge wastewater and stormwater into the Arkansas River in segment 34 of the Arkansas River Basin. The permit authorizes the discharge of specified quantities of pollutants from two point sources designated as outfalls 001 and 002. Outfall 001 primarily discharges treated wastewater while outfall 002 primarily discharges non-process stormwater runoff. Affidavit of Vince Blubaugh at 2.

On December 10, 1982, the administrator of the Environmental Protection Agency (EPA) issued to defendant NPDES permit number AR0036552. This permit was effective from January 20, 1983, through January 19, 1988. The permit set forth discharge limitations, monitoring, and reporting requirements for outfalls 001 and 002. The applicable regulations state that a permit remains in effect until the effective date of a new permit. 40 C.F.R. § 122.6.

The Administrator of the EPA authorized the Arkansas Department of Pollution Control and Ecology (ADPC & E) pursuant to 33 U.S.C. § 1342(a)(2) to issue NPDES permits on November 1, 1986. 51 Fed.Reg. 44518 (Dec. 10, 1986). The applicable Arkansas law is the Arkansas Water and Air Pollution Control Act, Ark.Code Ann. § 8–4–101 et seq.

Pursuant to its delegated authority the ADPC & E issued NPDES permit number AR0036552 to the defendant on July 29, 1988, to be effective from September 1, 1988, through August 31, 1993. The 1988 permit set forth new discharge limitations for outfalls 001 and 002. The permit also contained provisions regarding permit compliance, monitoring, and reporting requirements.

In response to plaintiff's interrogatories the defendant identified 127 instances in which it exceeded permit limitations between October 1, 1986, and September 17, 1991. The plaintiff identified with reference to defendant's Discharge Monitoring Reports (DMR) and laboratory records specific violations of the permit limitations and/or requirements. The most recent alleged violation occurred on October 24, 1991, after this suit was filed.

Neither the EPA or the state of Arkansas has filed a judicial action concerning the violations alleged by the plaintiff. However, the EPA has issued a series of seven compliance orders pursuant to its administrative enforcement powers. 33 U.S.C. § 1319(a). The last compliance order was issued on February 24, 1992.

Plaintiff provided the requisite notice of the commencement of a civil action on July 2, 1991. 33 U.S.C. § 1365. This action was commenced on September 26, 1991. Plaintiff has alleged continuous violations of the permit requirements. Plaintiff alleges its members have used the waters and nearby areas downstream from defendant's discharge, including the Arkansas River, for fishing, boating, hunting, trapping and nature study. It is alleged that they have contacted the water and eaten fish caught in the Arkansas River.

This matter is currently before the court on the parties' cross motions for summary judgment and the plaintiff's motion for a preliminary injunction and permanent injunctive relief. The court will address the issues raised in turn.

*Preclusive Effect of § 1319(g)(6)(A).*

As a preliminary matter defendant argues this suit is barred by Section 1319(g)(6)(A). Defendant contends the 1987 amendment to the Clean Water Act bars any citizen suit claims premised upon either past or continuing NPDES permit violations where the EPA has already initiated an administrative compliance order under Section 309 of the Act, 33 U.S.C. § 1319.

The Clean Water Act, 33 U.S.C. § 1251 et seq., was enacted "to restore and maintain the chemical, physical, and biological integ-

rity of the Nation's waters." 33 U.S.C. § 1251(a). The Act makes unlawful the discharge of any pollutant into navigable waters except as authorized by specified sections of the Act. 33 U.S.C. § 1311(a). One of the statutory exceptions allows for issuance of NPDES permits, 33 U.S.C. § 1342(a), authorizing the discharge of pollutants in accordance with specified conditions of the permit.

A permit holder is subject to both federal and state enforcement action for failure to comply with the conditions of the permit. 33 U.S.C. §§ 1319, 1342. Under the Act, citizens are permitted to commence civil actions against any person "alleged to be in violation of" the conditions of a NPDES permit. 33 U.S.C. § 1365(a)(1). A "citizen suit is meant to supplement rather than to supplant governmental action." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*, 484 U.S. 49, 60, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). The Act specifically provides that statutory and common law rights are not restricted. 33 U.S.C. § 1365(f); *United States EPA. v. Green Forest*, 921 F.2d 1394, 1399 (8th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 414, 116 L.Ed.2d 435 (1991).

The Act bars a citizen suit if it would duplicate court proceedings initiated by either a federal or state entity. 33 U.S.C. § 1365. Section 1365 precludes an action "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order...." 33 U.S.C. § 1365(b)(1)(B). However, the section further provides that in any such action "any citizen may intervene as a matter of right." *Id.*

In 1987, Congress amended § 1365(a) by providing an additional preclusion provision, 33 U.S.C. § 1319(g)(6). This is the provision that is at issue here. The 1987 amendments added subsection (g) which authorizes the EPA to assess administrative penalties. 33 U.S.C. § 1319(g). Subsection (g)(6)(A)(i) precludes a citizen suit for civil penalties regarding any violation "with respect to which the Administrator or the Secretary has commenced and is diligently prosecuting an action under this section." 33 U.S.C. § 1319(g)(6)(A)(i). In its entirety subsection (g)(6) provides:

(6) Effect of order

(A) Limitation on actions under other sections

Action taken by the Administrator or the Secretary, as the case may be, under this subsection shall not affect or limit the Administrator's or Secretary's authority to enforce any provision of this chapter; except that any violation—

(i) with respect to which the Administrator or the Secretary has commenced and is diligently prosecuting an action under this subsection,

(ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or

(iii) for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be,

shall not be the subject of a civil penalty action under subsection (d) of this section or section 1321(b) of this title or section 1365 of this title.

(B) Applicability of limitation with respect to citizen suits

The limitations contained in subparagraph (A) on civil penalty actions under section 1365 of this title shall not apply with respect to any violation for which—

(i) a civil action under section 1365(a)(1) of this title has been filed prior to commencement of an action under this subsection, or

(ii) notice of an alleged violation of section 1365(a)(1) of this title has been given in accordance with section 1365(b)(1)(A) of this title prior to commencement of an action under this subsection and an action under section 1365(a)(1) of this title with respect to such alleged violation is filed before

the 120th day after the date on which such notice is given.

In contrast to the § 1365 limitation, the subsection (g)(6) preclusion does not apply if the EPA commences an administrative action after the plaintiff gives notice of the alleged violation pursuant to section 1365(a)(1). 33 U.S.C. § 1319(g)(6)(B)(ii).

In the present case the EPA has issued a series of administrative compliance orders pursuant to 33 U.S.C. § 1319(a). Several of the orders contain the following or substantially similar language:

> Issuance of this Order does not preclude the pursuit of additional enforcement action including additional administrative penalty orders, and/or civil or criminal judicial actions for the violations cited herein. Failure to reach a satisfactory solution to this matter at the meeting referenced under the ORDER portion of this document will result in an EPA administrative penalty or referral to the U.S. Department of Justice for judicial action with monetary fines.

Defendant argues that this suit is barred by § 1319(g)(6) because the EPA's enforcement actions have been timely and diligent. Defendant states "[i]t is clear that the EPA has and is in the process of diligently prosecuting Bekaert through a series of administrative enforcement orders which are covering the very violations for which plaintiff is complaining." In opposition, plaintiff contends the preclusion provision of subsection (g)(6) does not bar this action because the EPA's actions have been taken pursuant to § 1319(a) compliance orders rather than § 1319(g) the administrative penalties section.

Although the section (g)(6) provisions have been in effect since 1987, case law interpreting them is scant. The parties have not cited, nor has the court's own independent research revealed, any reported decisions interpreting § 1319(g)(6)(A)(i). There are, however, several federal court decisions interpreting § 1319(g)(6)(A)(ii). As quoted *supra* that provision precludes citizen suits regarding any violation "with respect to which a State has commenced and is diligently prosecuting an action un-der a State law *comparable* to this *subsection.*" 33 U.S.C. § 1319(g)(6)(A)(ii) (emphasis added).

In *North & South Rivers Watershed Ass'n v. Scituate,* 949 F.2d 552 (1st Cir. 1991) the court construed § 1319(g)(6)(A)(ii) and held that a state action could be regarded as being comparable to an action under § 1319(g) even though the state action did not seek to sanction the offender monetarily. In rejecting the more restrictive interpretation advanced by the citizens, the court stated "[s]uch an interpretation of section 309(g) [33 U.S.C. § 1319(g)] would enable citizen's suits to undermine the supplemental role envisioned for section 505 [33 U.S.C. § 1365] citizen's suits, 'changing the nature of the citizen's role from interstitial to potentially intrusive.'" *North & South,* 949 F.2d at 556. The court further noted the "state's decision not to utilize penalty provisions does not alter the comparability of the State Act's statutory scheme to the scheme found in the Federal Act. While the specific statutory section under which the State issued its Order does not, itself, contain a penalty provision ... another section of the same statute does contain penalty provisions." *Id.* Thus, the state statutory scheme as a whole was found to be comparable to § 1319(g).

Finally, in summarizing its reasoning the court noted:

> Appellant urges that we determine comparability upon whether the precise statutory section under which the State issued its Administrative Order contains penalty provisions comparable to the Federal Act. Such a narrow reading of section 309(g)(6)(A), which turns on the logistical happenstance of statutory drafting, ignores two important considerations. First, the interdependent scheme of the State Act effectuates its goals of ensuring compliance with and enforcement of protective regulations. The focus of the statutory bar to citizen's suits is not on state statutory construction, but on whether corrective action already taken and diligently pursued by the government seeks to remedy the same

violations as duplicative civilian action. DEP is already acting to correct the violations upon which Appellants focus their action. Duplicative enforcement actions add little or nothing to compliance actions already underway, but do divert State resources away from remedying violations in order to focus on the duplicative effort.

Second, the goal of all actions brought under the Clean Water Acts is 'to restore and maintain the chemical, physical, and biological integrity of the nation's waters.' 33 U.S.C. § 1251(a). Duplicative actions aimed at exacting financial penalties in the name of environmental protection at a time when remedial measures are well underway do not further this goal. They are, in fact, impediments to environmental remedy efforts.

It is enough that the Massachusetts statutory scheme, under which the State is diligently proceeding, contains penalty assessment provisions comparable to the Federal Act, that the State is authorized to assess those penalties, and that the overall scheme of the two acts is aimed at correcting the same violations, thereby achieving the same goals. What the Appellant's suit seeks to remedy is already in the process of being remedied by the State Administrative Order, an action comparable to section 309(g).

*Id.* at 556.

The court then went on to conclude that the scope of § 1319(g)(6) preclusion included all forms of civilian actions whether the action sought penalties or declaratory and injunctive relief. *Id.* at 557. In so holding, the court primarily relied on the fact that § 1365 simply provides citizens with a general grant of jurisdiction for all remedies available and does not differentiate between penalty actions and actions for injunctive relief. *Id.* at 557–58. In light of the "statutory language suggesting a link between civilian penalty and injunctive actions," the court concluded that the "section 309(g) bar extends to *all* citizen actions brought under section 505, not merely civil penalties." *Id.* at 558 (emphasis in original). The court considered it to be inconceivable that "the section 309(g) ban is only

meant to extend to civil penalty actions." *Id.*

This same provision, § 1319(g)(6)(A)(ii) was considered by the court in *Connecticut Coastal Fishermen's Ass'n. v. Remington Arms,* 777 F.Supp. 173 (D.Conn. 1991). The court, after reviewing the case law, concluded section 1319(g)(6)(A)(ii) "bars citizen suits where a state agency conducting enforcement proceedings against the defendant has authority to assess civil penalties, regardless of whether the agency has actually assessed such penalties." *Id.* at 181. *See also New York Coastal Fishermen's Ass'n. v. Department of Sanitation,* 772 F.Supp. 162, 165 (S.D.N.Y.1991); *Atlantic States Legal Foundation, Inc. v. Tyson Foods,* 682 F.Supp. 1186 (N.D.Ala.1988).

It is defendant's position that the reasoning of these cases applies equally to section 1319(g)(6)(A)(i). Defendant strenuously objects to a narrow reading of the applicable subsection and contends that adopting the plaintiff's interpretation would circumvent the plan envisioned by the Act by allowing citizen suits even if an enforcement action is ongoing merely because the agency choose to forego or reserve penalty proceedings. We are told that adoption of plaintiff's interpretation would have dire consequences and would detract from enforcement actions already underway by limiting the discretion previously given to agency action.

The defendant bases its arguments primarily on what it regards as the policy of the Act and the Act's ultimate goals. While the court believes these are relevant concerns and areas of inquiry, the court's first duty is to construe the language of the statute as written.

There are crucial differences in the language contained in § 1319(g)(6)(A)(ii) and that found in § 1319(g)(6)(A)(i). The crucial phrase "an action *comparable* to this subsection" is not found in § 1319(g)(6)(A)(i). Each case construing § 1319(g)(6)(A)(ii) turned on the issue of the comparability of the overall state regulatory scheme rather than the individual sec-

tion of state law. In contrast § 1319(g)(6)(A)(i) requires the diligent prosecution of an "action under *this subsection*" before the bar to a citizens suit applies. (emphasis added). The term "this subsection" obviously refers to § 1319(g) which provides for administrative penalties. As noted by the Court in *Gwaltney*, " '[s]ection 1319 [§ 309] does not intertwine equitable relief with the imposition of civil penalties. *Instead each kind of relief is separately authorized in a separate and distinct statutory provision.' " *Gwaltney*, 484 U.S. at 58, 108 S.Ct. at 382 (quoting· *Tull v. United States*, 481 U.S. 412, 425, 107 S.Ct. 1831, 1839, 95 L.Ed.2d 365 (1987)) (emphasis added). Thus, there is no connection or statutory link between the kinds of relief available for agency enforcement. As the *Gwaltney* court noted, this is in direct contrast to the citizen suit provision which "suggests a connection between injunctive relief and civil penalties." *Gwaltney*, 484 U.S. at 58, 108 S.Ct. at 382.

Thus, both the structure of the Act and its language indicate § 1319(g)(6)(A)(i) only precludes a citizen's suit if the Administrator is diligently prosecuting an action for administrative penalties. Congress has defined when citizen suits are barred by administrative action in § 1319(g)(6). Congress has not provided that citizen suits are barred whenever an administrative action is underway or simply because there may be some duplication with a government proceeding.

The administrative orders involved herein are compliance orders entered pursuant to § 1319(a) and not the administrative penalties subsection § 1319(g). As this is not an action under § 1319(g), we need not reach the "diligent prosecution" aspect of the § 1319(g)(6)(A)(i) bar.

*Standing/Jurisdiction.*

■ Defendant has advanced two distinct arguments regarding plaintiff's ability to bring this suit. First, defendant argues that plaintiff has failed to meet the requirements of associational standing. Second, defendant relying on *Gwaltney* contends the jurisdictional grant contained in 33 U.S.C. § 1365 does not extend to wholly past violations. *Gwaltney v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).

Under Article III of the Constitution, federal courts may resolve only actual cases or controversies. U.S. Const. Art. III, § 2. A party has standing to sue if the party "has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy...." *Sierra Club v. Morton*, 405 U.S. 727, 731–32, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). The Supreme Court has stated that "at an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant' ... and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision'...." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

An association may have standing to assert the claims of its members "when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The latter two requirements are not at issue here.

The relevant inquiry then is whether the plaintiff's members would have standing to sue in their own right. The Clean Water Act authorizes the filing of a citizen suit by "any person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). The *Valley Forge* case establishes three basic requirements for individual standing. A party must demonstrate the following: (1) he has personally suffered actual or threatened injury as a result of the defendant's conduct or action; (2) the injury can be fairly traced to the

conduct or action; and (3) the party's injury is likely to be redressed by a favorable decision in the matter. *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758.

In this case the plaintiff has provided the affidavits of three of its members in support of its contention that the individual members have standing to sue. The affidavits indicate these members frequently fish and boat on the Arkansas River immediately downstream of the area where Bekaert discharges its wastewater into the river. Each member indicates that he frequently eats the fish caught in the river and is very concerned about the pollutants being discharged into the river. Additionally it is asserted that keeping the river free of pollution is extremely important for recreational, aesthetic and public health reasons.

As the Court in *Sierra Club* recognized "[a]esthetic and environmental well-being ... are important ingredients of the quality of life in our society." *Sierra Club*, 405 U.S. at 734, 92 S.Ct. at 1366. Citing *Sierra Club* the defendant argues that the generalized interests advanced by the plaintiff and its members herein are insufficient to meet the standing requirements established by the Supreme Court. However, the Court in *Sierra Club* indicated that an allegation that the members used the specific area in question would have been sufficient to confer standing. The Court noted that "[t]he Sierra Club failed to allege that it or its members would be affected in any of their activities or pastimes by the Disney development. Nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents." *Sierra Club*, 405 U.S. at 735, 92 S.Ct. at 1366.

Here the members have alleged use of the area in question and have indicated their concerns over the effect of the pollutants on the recreational and aesthetic values of the area as well as the effect of such pollutants on the fish caught in the river. We believe these allegations are sufficient to establish an individual injury in fact.

Bakeart contends plaintiff has failed to demonstrate that the injuries suffered by its members are fairly traceable to the defendant's violations of its NPDES permit. Defendant points out that no evidence has been presented showing any of the following effects: physical injury on the part of plaintiff's members as a result of swimming or other contact with the water; harm to the aquatic life; decrease in the quality of the area's drinking water; decrease in the aesthetic values of the area including the appearance of the river.

In *Public Interest Research Group of New Jersey v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64 (3rd Cir.1990) the court in discussing the fairly traceable requirement noted that "a permit exceedance alone is not sufficient to satisfy the second prong of *Valley Forge*...." *Id.* at 72.

The court further noted:

The requirement that plaintiff's injuries be 'fairly traceable' to the defendant's conduct does not mean that plaintiffs must show to a scientific certainty that defendant's effluent, and defendant's effluent alone, caused the precise harm suffered by the plaintiffs. A plaintiff need not prove causation with absolute scientific rigor to defeat a motion for summary judgment. The 'fairly traceable' requirement of the *Valley Forge* test is not equivalent to a requirement of tort causation. *Cf. Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 78, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978).

The standing requirement ensures that parties will not 'convert the judicial process into "no more than a vehicle for the vindication of the value interests of concerned bystanders."' *Valley Forge*, 454 U.S. at 473, 102 S.Ct. at 759 (quoting *United States v. SCRAP*, 412 U.S. 669, 687, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973)). In order to demonstrate that they are more than 'concerned bystanders,' plaintiffs need only show that there is a 'substantial likelihood' that defendant's conduct caused plaintiffs' harm. *Duke Power Co.*, 438 U.S. at 75 n. 20, 98 S.Ct. at 2631 n. 20, 57 L.Ed.2d 595 (1978).

In a Clean Water Act case, this likelihood may be established by showing that a defendant has 1) discharged some pollutant in concentrations greater than allowed by its permit 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs.

*Id.*

Plaintiff has alleged defendant has violated its permit limits for chemical oxygen demand (COD), oil and grease, iron, zinc, lead and pH. The pollutants discharged by the defendant have adverse environmental effects. In particular, the EPA has found that there is no safe threshold for human exposure to lead. 56 Fed.Reg. 2640, 26467–26471 (June 7, 1991).

The argument advanced here by the defendant that plaintiff must point to a specific injury or harm caused by the defendant is too stringent a requirement. Carried to the extreme it would mean for example that the plaintiff could not sue until the waterway was unable to support aquatic life. Such a requirement would "virtually emasculate the citizen's suit provision by making it impossible for any plaintiff to demonstrate standing." *Chesapeake Bay Foundation v. Bethlehem Steel Corp.,* 608 F.Supp. 440, 446 (D.Md.1985). *See also Natural Resources Defense Council, Inc. v. Outboard Marine Corp.,* 692 F.Supp. 801, 808 (N.D.Ill.1988). "Indeed, such a causation standard would compel a stricter showing for standing than for liability under the Act, where proof of a permit violation is sufficient." *Id.* at 808 (*citing Student Public Interest Research Group of New Jersey v. Georgia–Pacific Corp.,* 615 F.Supp. 1419, 1424 (D.N.J.1985).

Here plaintiff has alleged numerous permit violations of pollutants that have been proven to be harmful to the environment and humans in a variety of ways. The pollutants have the potential of directly affecting the plaintiff's enjoyment and use of the area in question. We believe this nexus is sufficient to meet the fairly traceable requirement. Our conclusion is further bolstered by the provisions of § 1365 which "make plain that the interest of the citizen-plaintiff is primarily forward looking." *Gwaltney,* 484 U.S. at 59, 108 S.Ct. at 382.

The final prong of the *Valley Forge* test requires the plaintiff to show that its injuries are "likely to be redressed by a favorable decision." *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758. "This requirement is closely related to the 'fairly traceable' element. While the fairly traceable element focuses on the connection between the defendant's conduct and the plaintiff's injury, the redressability factor focuses on the connection between the plaintiff's injury and the judicial relief sought." *Public Interest Research Group of New Jersey v. Powell Duffryn Terminals Inc.,* 913 F.2d 64, 73 (3d Cir.1990).

Plaintiff argues that "[s]ince defendant's excessive discharges can harm water quality and fish and wildlife populations, and plaintiff's members have health, environmental, and recreational interests in the integrity of that water and those populations, a cessation of defendant's excessive discharges will redress injuries to those interests." The court believes both an injunction and penalties would serve at least partially to redress the injuries plaintiff's claim. *See Public Interest Research of Group of New Jersey v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 73 (3d Cir. 1990).

Next, Bekaert argues the court is barred from hearing plaintiff's claims as they arise from wholly past violations of the Clean Water Act. The Supreme Court in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) held that § 1365(a) does not confer federal jurisdiction over citizens suits for wholly past violations.

Section 1365(a) of the Clean Water Act authorizes a private citizen to commence a civil action on his own behalf against any person "alleged to be in violation of" the Act. 33 U.S.C. § 1365(a). In *Gwaltney* the Supreme Court interpreted the words "in violation of" to be a "requirement that

citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney,* 484 U.S. at 57, 108 S.Ct. at 381. In doing so, the Court rejected the argument that citizen-plaintiffs must prove their allegations of ongoing noncompliance before jurisdiction attaches under § 1365, noting that the "statute does not require that a defendant 'be in violation' of the Act at the commencement of suit; rather, the statute requires that a defendant be '*alleged* to be in violation.'" *Gwaltney,* 484 U.S. at 64, 108 S.Ct. at 385.

The Court concluded that § 1365 "confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation...." *Id.* at 64, 108 S.Ct. at 385. The Court went on to issue the following caution:

> Our acknowledgement that Congress intended a good-faith allegation to suffice for jurisdictional purposes, however, does not give litigants license to flood the courts with suits premised on baseless allegations. Rule 11 of the Federal Rules of Civil Procedure, which requires pleadings to be based on a good-faith belief, formed after reasonable inquiry; that they are 'well grounded in fact,' adequately protects defendants from frivolous allegations.

*Id.* at 65, 108 S.Ct. at 385.

The allegations of ongoing permit noncompliance in this instance include allegations of post-complaint violations. This action was filed on September 26, 1991. It is alleged that on October 24, 1991, defendant violated its permit limits for chemical oxygen demand, oil and grease, lead, and zinc at outfall 002. Thus, plaintiff's allegations are sufficient to confer jurisdiction on the court. *See, e.g., Carr v. Alta Verde Industries, Inc.,* 931 F.2d 1055, 1065 n. 12 (5th Cir.1991) ("The issue is whether the plaintiff proved that the defendant continued to violate the Act subsequent to the complaint, or was likely to violate the Act intermittently. Evidence of the likelihood of a discharge at any time subsequent to the complaint is probative of this question, and proof of an actual violation subsequent to the complaint is conclusive."). In fact, defendant concedes it has some continuing problems with zinc and lead at Outfall 002. Defendant's Brief 2/21/91 at p. 10.

Defendant argues that, as "a necessary corollary to the Supreme Court's *Gwaltney* decision that citizens suits cannot be brought for past violations, courts must consider *each* parameter for *each* outfall separately in determining whether there is an ongoing violation." Thus, the defendant is arguing that even if the court has jurisdiction to hear the case because plaintiff has met the *Gwaltney* requirement of a good faith allegation of an ongoing violation, the court does not have jurisdiction as to particular parameter violations that are wholly past violations. With respect to these violations the contention is the case is moot.

To prevail on the merits the plaintiff must prove its allegations of ongoing violation. To withstand defendant's summary judgment motion the plaintiff must present evidence that demonstrates either (1) that violations continued on or after the date the complaint was filed, or (2) that a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. *Id.* The Supreme Court defined a § 1365 ongoing violation to be "a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney,* 484 U.S. at 57, 108 S.Ct. at 381. "Longstanding principles of mootness, however, prevent the maintenance of suit when 'there is no reasonable expectation that the wrong will be repeated.'" *Id.* at 66, 108 S.Ct. at 386. To have a case dismissed as moot the "defendant must demonstrate that it is '*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.*

The Court went on to note that the "[m]ootness doctrine thus protects defendants from the maintenance of suit under the Clean Water Act based solely on violations wholly unconnected to any present or future wrongdoing while it also protects plaintiffs from defendants who seek to

evade sanction by predictable 'protestations of repentance and reform.'" *Id.* at 66–67, 108 S.Ct. at 386. In cases such as this the standing and merit questions are intertwined. *Barrett Computer Services, Inc. v. PDA, Inc.,* 884 F.2d 214, 219 (5th Cir. 1989).

Defendant relies primarily on *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Inc.,* 890 F.2d 690 (4th Cir. 1989) for its argument that the court must undertake a parameter by parameter analysis of the defendant's violations. In that case the Court of Appeals for the Fourth Circuit considered separately violations of the T.K.N. (total kjeldahl nitrogen) limits and the chlorine limits of defendant's permit. In connection with the violation of the chlorine limits the court held it was "absolutely clear" that there were no ongoing chlorine violations at the time the suit was brought. The defendant had installed new chlorination equipment and made other modifications and as a result experienced no further violations of its chlorine problems. *Id.* at 697.

The court stated as follows:

Had Gwaltney violated no other permit parameters, the court would have had no subject matter jurisdiction over this suit. *Gwaltney,* 108 S.Ct. at 384–85.

However, Gwaltney did violate other parameters, including the TKN violations which were ongoing at the time suit was filed, and CBF seeks to use that fact to justify imposition of penalties for the chlorine violations. CBF contends that the jurisdictional requirement of § 1365 refers to finding an ongoing violation of the *permit;* having done so, the court may then impose penalties for any past violation of any permit *parameter.* We do not think the statutory language can support that position. Section 1365(a) permits citizen suits against persons alleged to be in violation of "an effluent standard or limitation." Penalties under § 1319(d) may be assessed for violations of 'any permit condition or limitation.' The entire structure of the Clean Water Act and regulations involves identifying specific pollutants and setting a permit

limit for each pollutant of concern. It thus makes sense within this scheme to view each parameter separately for purposes both of determining ongoing violation and of assessing penalties.

CBF's theory also runs against the reasoning of the Supreme Court in finding that there must be an ongoing violation to create subject-matter jurisdiction. If Congress wished to permit citizen suits only when a discharger fails to abate a problem and the government fails to take enforcement action, *see* 108 S.Ct. 382–83, then it would make little sense to permit penalties for wholly past violations of one parameter simply because there are ongoing violations of another parameter. The chlorine and TKN problems were due to distinct equipment and operational failures, and were corrected by distinct engineering solutions. While it was questionable at the time of suit whether Gwaltney had corrected its TKN violations, it was clear the company had abated its chlorine violations.

We therefore hold that the district court had no jurisdiction to impose penalties for Gwaltney's wholly past chlorine violations.

*Id.* at 697–98. *See also Allen County Citizens for Environment, Inc. v. B.P. Oil Co.,* 762 F.Supp. 733 (N.D.Ohio 1991) (considered separately alleged violations of thirteen parameters).

Plaintiff strongly disagrees with the defendant's requested application of the ongoing violation test to each pollutant parameter separately. Plaintiff argues that such an application "ignores the way that Clean Water Act permits work, and would require elaborate trials on the relationships among the various effluent parameters, outfalls and waste treatment devices just to determine the scope of the Court's jurisdiction."

The permit at issue herein was issued to Bekaert Corporation for their facility located in Van Buren, Arkansas. The permit covers two separate outfalls and sets effluent limitations for six separate pollutants. Section 1365 allows a citizen suit against anyone alleged to be in violation of

"an effluent standard or limitation." 33 U.S.C. § 1365(a). Section 1365(f) defines the term effluent standard or limitation to include "a permit or condition thereof issued under section 1342 of this title...." 33 U.S.C. 1365(f)(6). According to the plaintiff, it necessarily follows that it is the violation of the permit, not of individual permit terms, that must be ongoing for jurisdictional purposes. Plaintiff also refers the court to section 1342(k) which provides "[c]ompliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1312, 1316, 1317, and 1343 of this title...." 33 U.S.C. § 1342(k).

The Court's concern in *Gwaltney* was that a citizen suit should only be used to abate ongoing violations and were prospective in orientation. The Court repeatedly emphasized that the harm sought to be addressed lies in the present or future, not in the past. *Gwaltney*, 484 U.S. at 59, 108 S.Ct. at 382. To that end the court held that § 1365 conferred jurisdiction over citizen suits when good-faith allegations were made of continuous or intermittent violations. *Id.* at 64, 108 S.Ct. at 385. The court stressed that the mootness doctrine would prevent the maintenance of a suit for violations wholly unconnected to any present or future wrongdoing. *Id.* at 67, 108 S.Ct. at 386.

The language in *Gwaltney* is reasonably susceptible to the interpretations advanced by both parties. Giving due consideration to the exact question before the *Gwaltney* Court, we believe the correct analysis falls somewhere between the positions advanced by the parties.

The *Gwaltney* Court determined the threshold requirements necessary before a citizen could invoke the jurisdiction of the court under § 1365. Analyzing the statutory language, structure, and related legislative history the court determined a citizen suit could not be brought to redress wholly past violations. Thus, the citizen plaintiffs must *allege* ongoing violations of the *permit.*

To prevail on the merits, however, the plaintiff must *establish* ongoing permit violations. At this point the defendant could invoke the protections of the mootness doctrine by making "absolutely clear" that the behavior could not reasonably be expected to recur. *Id.* at 66, 108 S.Ct. at 386. It is at this step in the analysis a parameter by parameter analysis was undertaken by the Court of Appeals for the Fourth Circuit.

However, the mootness doctrine would only prevent the suit from going forward and therefore divest the court of jurisdiction if the defendant was in full compliance with the permit. If this is not the situation, the suit may proceed and the court would then need to determine what, if any, penalties were appropriate. It is at this final stage of determining what relief plaintiff is entitled to that the court should consider the efforts made by the defendant to eliminate past problems and whether specific pollutant problems have been fully abated.

 Thus, the "ongoing violation" requirement permeates the court's analysis at each stage of the proceedings. First, the court must determine whether the plaintiff has made a good faith allegation of ongoing permit violations. Second, to prevail on the merits plaintiff must establish ongoing permit violations. Third, in determining the appropriate relief on a citizen suit the court may want to undertake a parameter by parameter analysis to determine whether the violation of a particular effluent limitation is ongoing.

*Liability under the Act.*

 As the defendant admits ongoing lead and zinc excursions at outfall 002, the plaintiff has clearly met its burden with respect to liability under the Act. Affidavit of Scott Wishart, ¶ 17, p. 10; Affidavit of Dennis Ford, ¶ 4 at p. 2. The fact that defendant asserts the discharge has not had an adverse affect on the environment does not matter. *United States v. CPS Chemical Co.*, 779 F.Supp. 437, 450 (E.D.Ark.1991). "Compliance with the Act is a matter of strict liability and a permittee's intention to comply or good faith at-

tempt to do so does not excuse a violation." *CPS Chemical Co.,* 779 F.Supp. at 442. The discharge monitoring reports (DMRs) "may be used to establish the permittee's liability under the Act by showing that the permittee has exceeded its NPDES permit limitations." *Id.*

Plaintiff has alleged 163 violations of the discharge limitations and 44 violations of the monitoring and reporting requirements of the permit. It is plaintiff's position that a reporting violation continues until a corrected report is filed. In *Sierra Club v. Simkins Industries, Inc.,* 847 F.2d 1109 (4th Cir.1988), *cert. denied,* 491 U.S. 904, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989), the court rejected the argument that the defendant could defend against its failure to file complete DMRs or retain records by noting that the underlying data was never collected in the first instance. The court stated that "[i]n this context, where the permit expressly establishes a continuing obligation to retain records and file complete DMRs, to allow such a defense to jurisdiction would effectively provide a permit holder with the opportunity to escape liability under § 1365(a) by failing at the outset to sample and to create and retain the necessary monitoring record on possibly harmful and unlawful effluent discharge levels." *Id.* at 1115.

█ If the court correctly understands the plaintiff's contention in this case, the *Sierra Club* case does not support its position that every violation of the reporting requirements of a permit continues until a corrected DMR is filed. Here the defendant did not fail to maintain the underlying data and seek to escape liability in that manner; rather, the defendant sampled in a manner plaintiff contends is inconsistent with permit requirements or derived its reported figures in a manner that plaintiff contends violates the permit. The manner of sampling or the manner in which the defendant calculates its reported discharges or monthly average for its discharges can itself be an ongoing violation. However, the court does not believe that a violation is regarded as continuing if the defendant merely incorrectly reported an effluent discharge on a DMR at some point and failed to file a corrected DMR.

With the exception of admitting ongoing violations of the lead and zinc standards at outfall 002, the defendant claims the causes for exceedance have been rectified by equipment or practice modifications or were attributable to conditions which are certain not to reoccur. With regard to the lead and zinc exceedances from outfall 002 we are told that there has been an ongoing investigation of the sources of stormwater contamination and that defendant has installed scrubbers on the zinc electro-plating process. The administrative compliance orders outline the efforts made by defendant in this regard. Since 1986 the defendant states it has spent over $700,000 on corrective action projects for compliance at outfalls 001 and 002.

█ According to the defendant there have been no violations at outfall 001 since June 2, 1990, and defendant requests entry of summary judgment on these past permit violations. The court believes the defendant is entitled to summary judgment with regard to the alleged violations of outfall 001. Defendant has been in compliance with its permit at outfall 001 for a substantial period of time and plaintiff has not established any likelihood that these violations are continuing. This ruling makes it unnecessary for the court to determine whether defendant's methodology for calculating the monthly average for zinc in January, 1990, was inconsistent with the permit requirements since the calculation concerned zinc discharges from outfall 001.

█ Additionally, defendant requests entry of judgment for certain zinc exceedances on the basis of an interim order entered by the EPA. In its administrative order issued February 5, 1990, the EPA imposed an interim effluent limitation for zinc at outfall 002 to be effective from the date the defendant received the order, February 8, 1990, until October 1, 1990. Plaintiff contends it is not bound by this interim limit because the interim limit does not modify the permit limit for zinc at outfall 002. In support plaintiff, *inter alia,* cites

*Public Interest Research Group, Inc. v. Rice*, 774 F.Supp. 317, 325 (D.N.J.1991).

In that case the EPA had issued interim effluent limitations and by so doing agreed to accept the interim limits and not take additional enforcement action against the facility while the interim limits were in effect and the facility was in compliance with those limits. In discussing the effect of the interim limits the court stated as follows:

> [T]his court will not set, modify, or revoke the effluent limitations that are set by the 1989 permit. This court, however, is presented with a situation where there have been substantial and continuous effluent discharges into Crosswicks Creek and its tidally-related waterways that have caused obvious harm to these plaintiffs. Therefore, this court is required to order the defendant to attempt to comply with the standards that are set in the 1989 permit. This involves no encroachment on the EPA's area of expertise. Rather, it represents the vindication of the plaintiffs' right to bring suit, when the Agency cannot or will not protect the environment.
>
> Primarily, it should be noted that this court is reluctant to enter the regulatory domain of the EPA. Plaintiffs, however, have shown that the limits set in the 1990 Order on Consent are insufficient to protect the relevant area. This is not, as the defendant contends, an attempt by the plaintiffs to gain merely personalized relief, precluding action by this court. The defendant has been discharging and continues to discharge toxic pollutants into our nation's waterways, damaging the environment.

*Id.* at 326 (citations omitted).

Applicable regulations governing the modification or revocation and reissuance of permits provide generally that there must be the same notice-and-comment and hearing procedures as are used in the issuance of the original permit. 40 C.F.R. §§ 122.62, 124.5. *See also Proffitt v. Rohm & Haas*, 850 F.2d 1007, 1012–1013 (3rd Cir.1988). Thus, "[c]hanges in permits may result only after certain regulatory procedures are followed and then only for certain reasons." *Public Interest Research Group v. United States Metals Refining Co.*, 681 F.Supp. 237, 245 (D.N.J. 1987). Permit conditions are not stayed by the filing of a request by the permittee for a permit modification, revocation and reissuance, or termination, or a notification of planned changes or anticipated noncompliance. 40 C.F.R. § 122.45(f).

Under these regulations an interim order would not alter the permit limitations. However, the court believes the EPA should be allowed considerable discretion is attempting to rectify pollution problems. The court is hesitant to hold that a permittee may be subject to suit for violating its permit limitations when the EPA has set another limitation by interim order. In this case, the plaintiff has not clearly established that the interim limit is insufficient to protect the area in question. Therefore, the court will not second guess the EPA and hold the defendant liable for zinc discharges that were within the limits provided by the interim order for the period in question.

■ Plaintiff has argued that the defendant violated the reporting requirements in its 1983 permit on 39 occasions between October, 1987, and September, 1988, by failing to report discharges of zinc and lead from outfall 002. The 1983 permit did not contain limits for discharges of zinc and lead. In its application for the 1983 permit the defendant stated that zinc and lead were believed absent from its discharges from outfall 002. Among the reporting requirements set forth in the 1983 permit was the requirement that the defendant notify the EPA and ADPC & E "as soon as it knows or has reason to believe (a) [t]hat any activity has occurred or will occur which would result in the discharge of any toxic pollutant which is not limited in the permit, if that discharge will exceed the 'notification levels' in 40 CFR 122.61." Plaintiff's Exhibit C, Part II, Page 14, Para. 8(a).

Section 122.42 provides the notification level for routine and frequent discharges of toxic pollutants is, in pertinent part, 0.1

mg/1 or five times the reported maximum concentration level for that pollutant in defendant's permit application, whichever is higher. 40 C.F.R. § 122.42(a)(1). The notification level for nonroutine or infrequent discharges of toxic pollutants is, in pertinent part, 0.5 mg/1 or ten times the reported maximum concentration for that pollutant in defendant's permit application, whichever is higher. 40 C.F.R. § 122.42(a)(2).

Zinc and lead are designated as toxic pollutants. 40 C.F.R. § 401.15. As the 1983 permit did not set limits for discharges of zinc and lead the applicable limitations are those set forth in the regulations quoted above. Plaintiff has identified 39 occasions between October, 1987, and September, 1988, when the notification limitations set forth in the regulations were exceeded without the defendant's reporting the discharges. Defendant does not dispute the accuracy of the data or the plaintiff's identification of these instances; nor does the defendant contend these instances were reported. Rather defendant advises that this data was collected as part of the initial investigation into stormwater zinc and lead levels during the 1987 and 1988 permit application process. It is the defendant's position that the proper permit application to be used in calculating notification levels is the one submitted on July 17, 1987, not the 1983 application and permit. Using the application for the 1988 permit which contained zinc and lead levels, the defendant argues that no value obtained during the investigation exceeded the "five times" criteria.

The question then is what is the correct permit application to use as the baseline in calculating the relevant notification level? The court agrees with the plaintiff that it is the permit application for the 1983 permit and the 1983 permit that govern this issue. The 1983 permit sets forth the defendant's reporting requirements. Defendant was required by the terms of the 1983 permit to notify the appropriate agencies of the discharge of any toxic pollutant which was not limited by the permit. The notification levels specified by the regulations refer to the permit application. The only permit and permit application in existence prior to July of 1987 were the 1983 permit and permit application. The court cannot believe that the reporting requirements of the 1983 permit are determined by reference to the July, 1987, permit application. The 1988 permit was not in effect until September 1, 1988. The toxic discharges occurred between October, 1987, and September, 1988. The notification requirement applies throughout the permit term and the relevant standard should be determined by reference to the permit application for the 1983 permit. Accordingly, the failure to report the discharges of these toxic pollutants was a violation of the reporting requirements of the 1983 permit.

*Preliminary/Permanent Injunctive Relief.*

Plaintiff has asked for injunctive relief against the defendant. The issuance of a preliminary injunction is governed by the four part standard outlined by the Court of Appeals for the Eighth Circuit in *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109 (8th Cir.1981) (en banc). The extraordinary remedy should not be granted unless the movant demonstrates: 1) that it is threatened with irreparable harm; 2) that this harm outweighs any injury which granting the injunction will inflict on other parties; 3) that the movant will probably succeed on the merits; and 4) that the public interest favors an injunction. *Id.*

The standard for permanent injunctive relief is the same, except that the moving party must show actual success, instead of probable success, on the merits. *Amoco Production Co. v. Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). As discussed above, plaintiff is entitled to summary judgment on the issue of defendant's liability on certain of the alleged violations. Thus, plaintiff has demonstrated actual success on the merits.

In *Amoco* the court noted that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such

injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco,* 480 U.S. at 545, 107 S.Ct. at 1404. However, an injunction will not issue automatically for every technical violation of a permit. *Amoco Production Co. v. Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

■■■ Defendant argues that the request for injunctive relief must be denied as the plaintiff has failed to provide any evidence of any type of appreciable environmental harm. Defendant has admitted ongoing lead and zinc excursions at outfall 002 but contends these excursions have not caused lead and zinc concentrations in excess of the established acute toxicity criteria. We are told that the Arkansas River downstream of the Bekaert discharge is meeting water quality standards for aquatic life.

In *Public Interest Research Group v. Yates Industries, Inc.,* 757 F.Supp. 438 (D.N.J.1991) the court stated as follows:

[t]he court may grant an injunction even where plaintiffs have not established that *measurable* harm will otherwise result. The purpose of the Act is to reduce the total amount of effluent discharges. Injury occurs where discharge limits are exceeded. Thus, violation of an effluent standard under the Act presents strong evidence of irreparable harm, because permit parameters are 'precisely that part of the [Act] which is foremost concerned with the "underlying substantive policy" of the environmental law: the preservation of the environment and the protection of mankind and wildlife from harmful chemicals.'

*Id.* at 454 (citations omitted).

The court believes plaintiff has made a showing of irreparable harm in connection with the permit violations. In particular, the court is concerned with the ongoing lead and zinc excursions. The defendant has consistently exceeded these effluent limitations since the issuance of the 1988 permit and continues to do so. There can be no doubt that lead and zinc are harmful to the environment. Obviously the defendant's effluent violations contribute to the concentrations of these pollutants in the Arkansas River. The exceedances at issue, however, are not wastewater discharges; rather the lead and zinc effluent limitations are being exceeded by discharges of contaminated stormwater runoff.

The series of compliance orders issued by the EPA outline the efforts made to investigate and remedy the source of the contaminated runoff. In the February 24, 1992, administrative order the EPA indicates that the defendant "cannot comply with the final effluent limitations using the existing treatment works." The dominant source of contamination has been traced to roof runoff. The February 24 order outlines a schedule of activities with complete permit compliance to be obtained by February 28, 1993.

The court's job in determining whether an injunction should issue is not limited to determining whether the threat of irreparable harm exists. The court must also balance the harm and consider whether public interest favors the granting of the injunction. This is particularly difficult in this case. The EPA has determined that the defendant cannot at this point in time comply with the terms of the permit. Thus, the granting of an injunction requiring strict adherence to the effluent limitations set forth in the permit may very well put the defendant out of business.

Generally, any threat of economic loss to the polluter is outweighed by the benefit to the community from the enjoining of the activities that are adversely affecting the environment. The court would not hesitate to enjoin the defendant from violating the effluent limitations of the NPDES permit if compliance could be achieved by the mere expenditure of money. Under the particular circumstances of this case, it is clear that the expenditure of money alone will not bring the defendant into compliance. Here there is no ready answer to eliminating the stormwater contamination and further investigation and planning have been deemed necessary by the EPA. Additionally, there is no assurance that the issuance

of an injunction would prevent further effluent violations. The source of the contamination is stormwater runoff. Even if the defendant were to be shut down immediately, there is no indication that this would immediately end the contaminated runoff.

The EPA, the enforcement agency charged with preserving the environment, has of course more expertise in this field than the court. The court believes that it is in the best interests of the parties and the public to issue an injunction ordering the defendant to comply with the schedule set forth by the EPA in the February 24, 1992, administrative order. It is the view of the court that entry of a judicial order requiring prompt compliance with the EPA's administrative order will adequately serve the interests of the public. However, with respect to the monitoring and reporting requirements of the permit the defendant will be enjoined from further violations.

Plaintiff also seeks the imposition of civil penalties and an award of costs including attorneys fees. A hearing will be set on plaintiff's request for civil penalties. At that time the parties may present evidence concerning those factors set forth in 33 U.S.C. § 1319 that the court takes into account when determining the amount, if any, of penalties that will be assessed. A motion for attorneys' fees should be made at the conclusion of this case. A separate order in accordance herewith will be concurrently entered.

Dated this 10th day of April, 1992.

### ORDER

On this _____ day of April, 1992, came on for consideration the cross-motions for summary judgment filed by the parties and the plaintiff's motion for a preliminary injunction and permanent injunctive relief. The court finds for the reasons stated in a memorandum opinion of even date as follows:

1) That the plaintiff's motion for summary judgment on the issue of defendant's liability for violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*, is granted in part. Specifically, the motion is granted with regard to the defendant's permit violations at outfall 002 with the exception of the alleged permit violations for zinc that occurred between February 8, 1990, and October 1, 1990, when the interim limits were in effect.

2) That defendant's motion for summary judgment on the issue of its liability for permit violations occurring in the past at outfall 001 is granted.

3) That the plaintiff's are entitled to permanent injunctive relief. The defendant is ordered to comply with the reporting and monitoring requirements of its National Pollution Discharge Elimination System (NPDES) permit number AR0036552. In regard to the effluent limitations, the defendant is ordered to comply with the activities schedule set forth in the February 24, 1992, compliance order issued by the Environmental Protection Agency.

4) That the defendant shall submit to the plaintiff, from the date of this order until February 28, 1993, its discharge monitoring reports, noncompliance reports, and all other documents submitted to the United States Environmental Protection Agency concerning its NPDES permit within three days of its submission of these documents to the EPA.

IT IS SO ORDERED.