**Manuel ANDERSON et al., Plaintiffs,**

v.

**FARMLAND INDUSTRIES, INC., Defendant.**

**No. 98–2499–JWL.**

United States District Court, D. Kansas.

Sept. 22, 1999.

Randall K. Rathbun, Charles C. Steincamp, Depew and Gillen, L.L.C., Wichita, KS, James B McMath, Samuel E Ledbetter, Hank Bates, McMath, Vehik, Drummond, Harrison & Ledbetter, Little Rock, AR, for plaintiffs.

Terry W. Schackmann, Michael F. Saunders, Barry L. Pickens, Clayton L. Barker,

Spencer, Fane, Britt & Browne, Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

On November 2, 1998, plaintiffs filed suit against defendant Farmland Industries, Inc. pursuant to the citizen-suit provision of the Clean Air Act, 42 U.S.C. § 7604, alleging emissions and reporting violations at Farmland's refinery in Coffeyville, Kansas.[1] Plaintiffs, a group of individuals living near the refinery, seek the imposition of civil monetary penalties, injunctive relief, and attorneys' fees and costs. This matter is presently before the Court on plaintiffs' renewed motion for partial summary judgment on standing and the fifth cause of action (doc. # 55) and defendant's renewed motion for summary judgment on lack of standing for Counts V, VI, IX, and X (doc. # 51).

As set forth in more detail below, plaintiffs' renewed motion for partial summary judgment is granted in part and denied in part. Similarly, defendant's renewed motion for summary judgment is granted in part and denied in part.

## I. Facts[2]

Farmland currently owns and operates a refinery in Coffeyville, Kansas. At the refinery, Farmland operates certain equipment, including a coal-fired boiler, a Clause sulfur recovery unit, an FCCU catalyst regenerator, a Radco heater, and sixteen fuel gas combustion devices. Farmland has installed continuous emissions monitoring (CEM) equipment on the Radco heater, the Clause sulfur recovery unit, and the FCCU catalyst regenerator. Farmland has not installed monitoring equipment on any of the sixteen fuel gas combustion devices. Rather, these devices share a common fuel gas source with the Radco heater and Farmland monitors emissions from the Radco heater as a representative source to determine emissions from them.

Farmland must report the magnitude of emissions that exceed levels set forth in the Clean Air Act (CAA) to the Kansas Department of Health and the Environment (KDHE) on a quarterly basis. The extent of excess emissions must be reported in parts per million (ppm) in quarterly reports pursuant to 40 C.F.R. §§ 60.7(c) & 60.13(h). In the quarterly excess emissions reports for the fuel gas combustion devices and the Clause sulfur recovery unit submitted to KDHE for quarters in 1996–98, Farmland identified the magnitude of excess sulfur dioxide emissions in pounds, rather than in ppm. After the filing of this lawsuit, Farmland filed amended quarterly reports with the KDHE, giving the amount of sulfur in ppm for the 1996–98 reports. In the quarterly excess emissions reports for the Clause sulfur recovery unit submitted to KDHE for quarters in 1993–96, Farmland did not report the magnitude of excess sulfur dioxide in any units. After the filing of this lawsuit, Farmland filed amended quarterly reports with the KDHE, listing the magnitude of excess sulfur dioxide for the 1995–96 quarters. However, Farmland has not amended the 1993–94 quarterly reports because Farmland has not retained the data required to make such amendments.[3] In its 1st Quarter 1999 excess emissions report for the FCCU catalyst regenerator, Farmland did not report the magnitude of excess opacity emissions.

Under K.A.R. 28–19–202 & 28–19–210(c)(3)(d), Farmland is required to report air emission inventories to the KDHE

---

1. Plaintiffs have also asserted several common law claims arising out of defendant's alleged conduct. These claims are not relevant to the motions presently before the court.

2. These facts are deemed uncontroverted for the purposes of this motion.

3. Under 40 C.F.R. § 60.7(f), Farmland is only required to maintain its records, reports, and measurements for two years.

annually. These reports are used to calculate fees owed to the KDHE for excess sulfur dioxide emissions. Farmland's air emission inventory reports for 1994–96 did not account for sulfur dioxide emissions ·from emergency releases.

In the five years prior to plaintiffs' filing of their complaint, the Radco heater at Farmland's Coffeyville Refinery discharged sulfur dioxide in amounts greater than the 20 ppm emission limit, set forth in 40 C.F.R. § 60.104(a)(1), on 232 days. Farmland reported such occurrences to the KDHE in the Quarterly Emissions Reports for the Radco heater from the 4th Quarter 1993 until the 3rd Quarter 1998. Since the filing of plaintiffs' complaint, the Radco heater has discharged gas containing greater than 20 ppm sulfur dioxide on twenty days. Each of the sixteen fuel gas combustion devices also discharged gas containing greater than 20 ppm sulfur dioxide on the same twenty days. During thirty-seven hours on January 2–4, 1999, the fuel gas combustion devices discharged approximately 25,759 pounds of sulfur dioxide into the atmosphere over and above 20 ppm. During a seven-hour period on December 22, 1998, the fuel gas combustion devices discharged approximately 3,118.4 pounds of sulfur dioxide into the atmosphere over and above 20 ppm.

In the five years prior to plaintiffs' filing of their complaint, the FCCU catalyst regenerator at Farmland's Coffeyville Refinery discharged excess opacity in amounts greater than the 30% emission limit, set forth in 40 C.F.R. § 60.102(a)(2), on 396 days. Farmland reported such occurrences to the KDHE in the Quarterly Emissions Reports for the FCCU catalyst regenerator from the 4th Quarter 1993 until the 3rd Quarter 1998. Since the filing of plaintiffs' complaint, the FCCU catalyst regenerator has discharged gas exhibiting greater than 30% opacity on ten days.

In the five years prior to plaintiffs' filing of their complaint, the Clause sulfur recovery unit discharged sulfur dioxide in amounts greater than the 250 ppm emission limit, set forth in 40 C.F.R. § 60.104(a)(2)(*l*), on 254 days. Farmland reported such occurrences to the KDHE in the Quarterly Emissions Reports for the Clause sulfur recovery unit from the 4th Quarter 1993 until the 3rd Quarter 1998. Since the filing of plaintiffs' complaint, the Clause sulfur recovery unit has discharged gas containing greater than 250 ppm sulfur dioxide on six days.

Farmland's discharge of sulfur dioxide and particulate matter drifted over plaintiffs' homes. These excess emissions have interfered with plaintiffs' use and enjoyment of their homes and property. They were unsightly, smelled bad, and impaired the quality of the air that plaintiffs breathed.

## II. The Standing Inquiry

### A. Applicable Standards

■ Both parties have moved for summary judgment on the issue of whether plaintiffs have standing to bring this action. The Constitution extends the "judicial power" of the federal courts of the United States only to "Cases" and "Controversies." *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998) (citing U.S. Const. art. III, § 2, cl. 1). Standing to sue is an essential component of "what it takes to make a justiciable case." *Id.* (citing *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). The "irreducible constitutional minimum of standing" contains three requirements: (1) the plaintiff must have suffered an actual or threatened injury in fact; (2) there must be a causal connection between the injury and the defendant's complained-of conduct; and (3) the injury must be redressable by the relief sought. *See id.* at 1016–17.

■ This triad of injury in fact, causation, and redressability comprises the core of Article III's case-or-controversy requirement, and the party invoking federal

jurisdiction bears the burden of establishing its existence. *Id.* at 1017 (citing *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)). Here, then, plaintiffs have the burden of establishing that they have standing to bring this action. As the Supreme Court explained in *Lujan v. Defenders of Wildlife:*

> Since [the elements of standing] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts" which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial."

504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted).

**B. Discussion**

*1. Count V: Excess Emissions Violations—the Radco heater, the Clause sulfur recovery unit, and the FCCU catalyst regenerator*

In plaintiffs' motion for summary judgment, plaintiffs maintain that the uncontroverted facts demonstrate that plaintiffs have suffered injuries in fact; plaintiffs' injuries are traceable to defendant's conduct; and plaintiffs' injuries are redressable through injunctive relief by this court.

Defendant contests each of these assertions in its motion for summary judgment. As set forth below, the Court finds that plaintiffs have standing to bring this claim.

Farmland's first response to plaintiffs' motion for summary judgment is that plaintiffs have failed to establish adequately the first two prongs of the standing inquiry—injury in fact and causation. As plaintiffs highlight in their papers, however, Farmland has conceded certain facts material to this issue. In plaintiffs' Statement of Uncontroverted Facts, plaintiffs asserted the following:

> Farmland's excess emissions of sulfur dioxide, particulate matter and other pollutants drift over the plaintiffs' homes. These excess emissions interfere with the plaintiffs' use and enjoyment of their homes and property. They are unsightly, smell bad, and impair the quality of the air the plaintiffs breathe. *See* Affidavits of Nathaniel Johnson, Jr., Ronnie Davis and William C. Jenkins, filed herewith.

Farmland responded as follows:

> Denied. The emission sources referenced in plaintiffs' motion for partial summary judgment are not currently emitting excess emissions of sulfur dioxide or particulate matter over the plaintiffs' homes. *See* Hanley Aff. § 6(a), (h) and (*l*). Plaintiffs' allegations of excess emissions relate to past, not ongoing, conditions at the Refinery.

Farmland did not dispute that its excess emissions drifted over the plaintiffs' homes—demonstrating causation. Nor did Farmland dispute that the excess emissions interfered with the plaintiffs' use and enjoyment of their homes, was unsightly, smelled bad, and impaired the quality of the air that plaintiffs breathed—demonstrating injury in fact. Rather, Farmland only disputed whether its excess emissions are ongoing, facts relevant solely to the redressability prong of standing.[4]

---

**4.** Plaintiffs further allege that Farmland took the position that discovery was limited to the

redressability prong of standing and refused to honor plaintiffs' requests for documents

Rule 56.1 of the Rules of Practice and Procedure for the United States District Court, District of Kansas prohibits Farmland from now disputing facts that it did not specifically controvert in its response to the plaintiffs' Statement of Uncontroverted Facts. Rule 56.1 states: "All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." Thus, for summary judgment purposes, the court will deem the above facts admitted by Farmland and will not entertain new arguments on the injury in fact and causation prongs of standing.

This leaves the Court to address the standing prong truly at the heart of this dispute: redressability. The Supreme Court recently set forth the standard for redressability in *Steel Company v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).[5] Focusing only on the redressability prong of the standing inquiry, the Court ruled that to survive a defendant's motion for summary judgment a plaintiff must come forward with specific facts from which a reasonable fact finder could conclude either that defendant was in fact violating the act at the time plaintiffs filed their complaint or that future violations of the act were imminent. *See Steel Co.*, 118 S.Ct. at 1019; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

In support of their motion on the issue of standing, plaintiffs have come forward with ample evidence that equipment at Farmland's Coffeyville Refinery has discharged sulfur dioxide and particulate matter in excess of the limits set out in the CAA. Plaintiffs point to the CEM quarter-

ly reports for the 4th Quarter 1993 until the 3rd Quarter 1998 in which Farmland reported to the KDHE that it exceeded the emissions standards set forth in the CAA for the Radco heater and sixteen fuel gas combustion devices on 232 days, for the FCCU catalyst regenerator on 396 days, and for the Clause sulfur recovery unit on 254 days. Farmland's Class 1 Operating Permit Application also acknowledges that Farmland violated the emissions limits for this equipment prior to the filing of plaintiffs' complaint. To support their allegations that Farmland has continued to violate the CAA after the filing of their complaint, plaintiffs rely on the following: CEM reports for the 4th Quarter 1998 and the 1st Quarter 1999, as well as deposition testimony, to show twenty days of excess emissions from the Radco heater and sixteen fuel gas combustion devices; the CEM report for the 1st Quarter 1999 and a Quarterly Subpart J Performance report to show ten days of excess emissions from the FCCU catalyst regenerator; and the CEM report for the 4th Quarter 1998 and a Quarterly Subpart J Performance report to show six days of excess emissions from the Clause sulfur recovery unit.

Farmland does not dispute that any of these excess emissions occurred. Rather, Farmland alleges that the uncontroverted facts demonstrate that plaintiffs' injuries are not redressable because all violations of the CAA have been corrected or because all excess emissions from Farmland equipment occurred during periods of startup, shutdown, or malfunction and, thus, pursuant to 40 C.F.R. § 60.11(c)[6], are not violations of the CAA.

Farmland points out the following improvements that it made to the refinery to dispute plaintiffs' contention that Farm-

relevant to the causation and injury in fact prongs of standing.

5. For a detailed discussion of *Steel Co.*, see this Court's first order in this case: *Anderson v. Farmland Indus., Inc.*, 45 F.Supp.2d 863 (1999).

6. 40 C.F.R. § 60.11(c) reads: "The opacity standards set forth in this part shall apply at all times except during periods of startup, shutdown, malfunction, and as otherwise provided in the applicable standard."

land was in fact violating the act at the time plaintiffs filed their complaint or that future violations of the act were imminent. First, in February 1998, Farmland removed a blockage in the amine scrubbing device, a potential cause of sulfur dioxide emissions from the Radco heater. Second, in March 1998, Farmland installed a third sulfur recovery unit to help reduce the amount of sulfur dioxide discharged from the refinery. Third, in October 1998, Farmland completed the installation of new electrodes in the FCCU catalyst regenerator and in February 1999 installed a new flue gas cooler.

In response to plaintiffs' evidence of excess emissions after these improvements were made, Farmland argues that all of the excess emissions reported in the CEM quarterly reports relied upon by plaintiffs occurred during periods of startup, shutdown, and, most often, malfunction. Thus, according to Farmland, it did not violate the CAA during these periods. *See* 40 C.F.R. § 60.11(c). Plaintiffs' first response to the malfunction exception is that Farmland could not rely on it because Farmland did not meet the procedural reporting requirements set forth in K.A.R. 28–19–11.[7] However, Farmland has produced a letter from the KDHE stating that the requirements of K.A.R. 28–19–11 do not apply to emission sources governed by federal standards, such as those operating at the Farmland Coffeyville refinery. Thus, Farmland was only required to report the malfunctions to the KDHE in its quarterly CEM reports, which it did.

Plaintiffs next argue that the excess emissions do not meet the definition of "malfunction" as defined in 40 · C.F.R. § 60.2: "Malfunction means any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not malfunctions." Plaintiffs allege that the reason. given by Farmland, "extreme cold weather," to account for the excess emissions from the Radco heater and Clause sulfur recovery unit after the filing of plaintiffs' complaint is not justified by temperature records for the 1998–99 winter. Plaintiffs further present an affidavit asserting that the excess emissions from the FCCU catalyst regenerator were due to preventable maintenance and operational problems. Farmland notes that this affidavit only disputes the malfunction exception for the FCCU catalyst regenerator from October 1998, until February 1999, and that plaintiffs have not adduced evidence or expert opinions to dispute Farmland's other claims of malfunction.

■ The parties have presented no cases addressing whether the malfunction exception to the CAA emissions limits is a defense which the defendant must prove or whether the burden is on the plaintiff to prove that no such malfunction existed. The Court has also uncovered no such cases in its research.[8] However, in *United*

---

7. K.A.R. 28–19–11 states, in part: "Abnormal operating conditions resulting from malfunction breakdown, and or necessary repairs to control or processing equipment and appurtenances which cause emissions in excess of the limitations specified in the emission control regulations shall not be deemed violations provided that: (1) The person responsible for the operation of the emission source notifies the department of the occurrence and nature of such malfunctions, breakdown, or repairs, in writing, within ten (10) days of noted occurrence."

8. The United States District Court for the District of Nevada has concluded that the

plaintiff has the burden of showing that there are no genuine issues of material fact as to whether excess emissions occurred during malfunction periods when the plaintiff has moved for summary judgment based on liability. *See United States v. Nevada Power Co.,* No. CV–S–87–861–RDF, 1990 WL 149661, at *2 (D.Nev. June 1, 1990). This pronouncement, however, is consistent with general summary judgment law, placing on the moving party the burden to show that there are no fact questions concerning the non-moving party's affirmative defense in order to establish liability. *Nevada Power Co.* does not address which party bears the burden on this

*States v. First City National Bank,* 386 U.S. 361, 366, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967), the Supreme Court stated the general rule that the party claiming the benefits of an exception to the prohibition of a statute has the burden of proving it meets the exception. In *First City,* the Court examined the Bank Merger Act of 1966, which, although generally prohibiting bank mergers that violated certain antitrust laws, included a statutory exception permitting otherwise impermissible mergers in which the anticompetitive effects were clearly outweighed by the probable effect of the transaction in meeting the convenience and needs of the community to be served. 12 U.S.C. § 1828(c)(5)(B). The Court assigned to the merging banks the burden of proving their merger fell within the statutory exception. *See First City,* 386 U.S. at 366, 87 S.Ct. 1088. As in *First City,* the conduct to which the exception arguably applies in this case is conduct that otherwise falls within the statute, making application of the *First City* rule appropriate.

Moreover, placing the burden of proof on Farmland is consistent with how courts have treated another statutory exception analogous to that found in the CAA. In *United States v. Fleet Factors Corp.,* 901 F.2d 1550, 1555 (11th Cir.1990), the court examined 42 U.S.C. § 9601(20)(A), which excludes from the definition of "owner or operator" any "person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility." The Eleventh Circuit, citing *First City,* held that the party seeking to take advantage of the exception has the burden of proving it falls within the exception's scope. *Id.*

■ Because Farmland has the burden of proving the malfunction exception to the CAA, the Court deems plaintiffs' alleged lack of evidence disputing Farmland's defense of malfunction not to be determinative on standing in light of

issue on a motion for summary judgment

Farmland's burden of proof and its own conclusory factual support for the defense. Furthermore, despite the record presently before the Court showing that Farmland has made improvements to its equipment, plaintiffs' have produced uncontroverted evidence of excess emissions occurring after the filing of their complaint and have produced evidence, albeit meager, of temperatures which tend to refute Farmland's malfunction defense. Plaintiffs' evidence is ample to show that future CAA emissions violations by Farmland were imminent at the time plaintiffs filed their complaint. Thus, the Court finds that plaintiffs have standing to bring this claim.

**2. Count V: Quarterly Reporting Violations—reporting in pounds rather than in parts per million**

In the parties' cross-motions for summary judgment on standing, the parties also dispute the redressability prong of standing as it applies to the quarterly excess emissions reports which 40 C.F.R. §§ 60.7(c) & 60.13(h) requires Farmland to file with the KDHE. Plaintiffs allege that Farmland has violated and continues to violate these reporting requirements. As discussed above, to succeed on the redressability prong of standing, plaintiffs must come forward with specific facts from which a reasonable fact finder could conclude either that defendant was in fact violating the reporting requirements at the time plaintiffs filed their complaint or that future violations of the act were imminent. *See Steel Co.,* 118 S.Ct. at 1019. The Court finds that plaintiffs have met this burden and, thus, have standing.

Pursuant to 40 C.F.R. §§ 60.7(c) & 60.13(h), Farmland must report quarterly the excess emissions discharged from its refineries to the KDHE in ppm. In support of their motion on standing, plaintiffs have come forward with the reports for the fuel gas combustion devices and the Clause

based on standing.

sulfur recovery unit submitted to the KDHE for quarters in 1996–98. In those reports, Farmland identified the magnitude of excess sulfur dioxide emissions in pounds, rather than in ppm. At the time that plaintiffs filed their complaint, Farmland had not corrected the 1996–98 reports. Thus, plaintiffs assert, Farmland was violating the CAA when the complaint was filed, giving plaintiffs standing. Plaintiffs recognize that Farmland began filing emission reports in ppm after the 2nd Quarter 1998 report, but argue that this change was solely the result of Farmland's receipt of plaintiffs' letter giving notice of their intent to sue.

Farmland does not dispute plaintiffs' claims of reporting violations, but argues that the undisputed facts show that Farmland stopped reporting in pounds after its 2nd Quarter 1998 report—months before plaintiffs filed suit. Therefore, Farmland was not violating these reporting requirements at the time plaintiffs filed their complaint. Farmland further presents evidence of amended quarterly reports, which it filed with the KDHE after the filing of this lawsuit, giving the amount of sulfur in ppm for the 1996–98 reports. Farmland alleges that, given these changes in its reporting policy and the amended reports, plaintiffs have asserted no evidence that Farmland will revert to reporting only in pounds.

The resolution of this standing dispute turns on whether reporting violations uncorrected by the defendant at the time that suit is filed constitute an ongoing or imminent violation of the CAA where the defendant had ceased violating the reporting requirements prior to suit. In *Steel Co.*, the Supreme Court held that the respondent failed to meet the redressability prong of standing where the defendant corrected all ongoing reporting violations by filing with the relevant agencies *before* suit was filed. *Steel Co.*, 118 S.Ct. at 1009, 1018. In contrast, Farmland did not correct the 1996–98 emission reports until after plaintiffs filed suit. A similar situation existed in *Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109 (4th Cir. 1988). In *Simkins*, the defendant filed a defective report prior to the filing of the lawsuit and did not correct the report until almost three months after the plaintiff filed suit. *Id.* at 1114. In holding that the plaintiff had standing, the Fourth Circuit stated, "we conclude that Simkins' violations continued past the date Sierra Club filed its complaint. . . ." *Id.* at 1115.

Farmland attempts to distinguish *Simkins* by noting that the defendant there did not collect data necessary to file a report, while Farmland did collect data but reported it in the wrong units. The Court does not believe that Simkins' failure to collect data was a fact essential to the Fourth Circuit's determination that Simkins' failure to file reports at the time that suit was filed constituted a continuing violation. Rather, the Fourth Circuit simply noted that Simkins could not defend its failure to file the reports by alleging a lack of data. *Id.*

■ Under the combined reasoning of *Steel Co.* and *Simkins*, the Court concludes that plaintiffs' evidence of Farmland's uncorrected reports at the time suit was filed is adequate evidence from which a reasonable fact finder could conclude that Farmland's reporting violations were continuing when suit was filed.[9] Farmland did not change its practice of reporting in pounds, rather than in ppm, until after receiving notice of plaintiffs' intent to file

---

9. The Court recognizes that its conclusion is contrary to that propounded by the United States District Court for the Western District of Arkansas in *Arkansas Wildlife Federation v. Bekaert Corp.*, 791 F.Supp. 769 (W.D.Ark. 1992). Relying on the lack of data collected in *Simkins*, the *Bekaert* court held that *Simkins* does not stand for the position that a violation of reporting requirements continues until a corrected report is filed. *Bekaert*, 791 F.Supp. at 781. The *Bekaert* court gives no analysis to support its holding. Therefore, in accord with its discussion of *Simkins* above, this Court is not persuaded to follow the district court in *Bekaert*.

suit. That it took the threat of a lawsuit to stimulate Farmland into changing its method of reporting further convinces the Court that a reasonable fact finder could conclude that Farmland's reporting violations were ongoing or imminent for standing purposes.[10]

### 3. Count V: Quarterly Reporting Violations—failure to report the magnitude of excess emissions

A third standing inquiry exists as to Farmland's alleged failure to report the magnitude of its excess emissions to the KDHE as required by 40 C.F.R. §§ 60.7(c) & 60.13(h). Applying the legal standards for standing discussed above, the Court concludes that plaintiffs have standing.

In support of their motion for summary judgment, plaintiffs present the quarterly excess emissions reports for the Clause sulfur recovery unit submitted to the KDHE for quarters in 1993–96. In those reports, Farmland did not disclose the magnitude of excess sulfur dioxide emissions. Plaintiffs note that Farmland had not amended these reports at the time plaintiffs filed their complaint.

In response to plaintiffs' arguments, Farmland points the Court to its post-complaint amendments for the Clause sulfur recovery unit listing the magnitude of excess sulfur dioxide for the 1995–96 quarters. However, Farmland admits that it has not amended the Clause sulfur recovery unit quarterly reports for 1993–94 because the data required to maintain such information is not available. Under 40 C.F.R. § 60.7(f), Farmland is only required to maintain its records, reports, and measurements for two years. Thus, according to Farmland, no injunction or fine can redress this lack of data. Farmland further asserts that a consent decree entered in another case filed in this district comprehensively settled "all potential

claims of violations of ... the Clean Air Act by Farmland at the Coffeyville facility known to the EPA on or before April 30, 1996, including, but not limited to, the Clean Air Act claims alleged by the United States in the complaint." *United States v. Farmland Indus., Inc.,* Case No. 96–2360–KHV (D.Kan. Oct. 20, 1996). According to Farmland, then, the 1993–94 reporting violations were known to the EPA and the plaintiffs should not be entitled to revisit this issue, for which Farmland has already paid a fine.

As discussed in Section II.B.2 above, plaintiffs' evidence of Farmland's uncorrected reports at the time suit was filed is adequate evidence from which a reasonable fact finder could conclude that Farmland's reporting violations were continuing when suit was filed. Furthermore, because the issue of Farmland's settlement with the EPA of the 1993–94 reporting violations did not arise until defendant's reply brief, plaintiffs have not had an opportunity to respond to Farmland's arguments. Thus, the Court will disregard that argument in connection with this motion. *See Baty v. Willamette Indus., Inc.,* No. Civ.A. 96–2181–GTV, 1999 WL 713959, at *4 (D.Kan. Aug 16, 1999) ("In her reply brief, plaintiff for the first time requests attorney fees.... Because defendant has not had a chance to respond to this request, the court will not consider it in its memorandum and order"); *Employers Mutual Casualty Co. v. Miner,* 6 F.Supp.2d 1232, 1236 n. 15 (D.Kan.1998) ("the court will not grant summary judgment based on an issue raised for the first time in a reply brief"); *Medina v. City of Osawatomie,* 992 F.Supp. 1269, 1272–73 (D.Kan.1998) ("Courts in this district have been reluctant to consider issues raised for the first time in a reply brief") (citing a number of cases in support).

---

**10.** Farmland argues that even if the plaintiffs have standing to bring their claims of reporting violations based on the wrong units of measurements these claims are moot because

Farmland has corrected all the reports since the filing of suit. Farmland's mootness arguments will be taken up below.

In further support of their claim of standing, plaintiffs present the 4th Quarter 1998 and 1st Quarter 1999 reports for the FCCU catalyst regenerator in which Farmland failed to report the magnitude of its excess opacity emissions. Plaintiffs allege that Farmland also failed to report numerous incidents of excess opacity in these two quarters. Plaintiffs recognize that Farmland filed amended reports after May 12, 1999, showing fourteen additional days of excess opacity. However, plaintiffs present an affidavit stating that, based on charts developed from Farmland's monitoring equipment, Farmland should have reported excess opacity on five more days. Plaintiffs argue that these alleged reporting violations, occurring both before and after they filed suit, are enough for a reasonable fact finder to conclude that they have standing on this claim.

In response to plaintiffs' claims of post-complaint violations relating to the 4th Quarter 1998 and 1st Quarter 1999, Farmland first asserts that it did not violate the CAA by initially failing to report excess opacity on fourteen days. Farmland maintains that the excess opacity on these days was caused by steam, and that under K.A.R. 28–19–52, steam-induced opacity is not reportable. However, after consultation with the KDHE, Farmland amended the reports to include days of steam-induced excess opacity. As for plaintiffs' argument that Farmland failed to report additional excess opacity on five more days, Farmland has come forward with evidence that on four of the alleged days the entire refinery was shut down, making no reports due. On the fifth alleged day, the excess opacity occurred at midnight, leading Farmland to report it on the following day's report.

█ Farmland next argues that its alleged violation of the FCCU catalyst regenerator quarterly reports is a violation wholly distinct from the pre-complaint violations of the Clause sulfur recovery unit. Therefore, the alleged FCCU catalyst regenerator magnitude reporting violation is a completely new violation which has not yet been repeated and which cannot constitute a "continuing" violation of the Clause sulfur recovery unit magnitude reporting violation. In support of this contention, Farmland relies on *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 890 F.2d 690 (4th Cir. 1989), in which the court declared: "it would make little sense to permit penalties for wholly past violations of one parameter simply because there are ongoing violations of another parameter." *Gwaltney*, 890 F.2d at 698. However, *Gwaltney* distinguished the pre-complaint and post-complaint violations based on the fact that they "were due to distinct equipment and operational failures, and were corrected by distinct engineering solutions." *Id.* This case is distinguishable from *Gwaltney*. Here, the alleged reporting violations related to the magnitude of the FCCU catalyst regenerator emissions and the magnitude of the Clause sulfur recovery unit emissions involve the same reporting requirements of 40 C.F.R. §§ 60.7(c) & 60.13(h). They also implicate the same incorrect practice of failing to report the magnitude of excess emissions from a facility governed by 40 C.F.R. Part 60, Subpart J. Furthermore, the Third Circuit has rejected the *Gwaltney* ruling as too strict. *See Natural Resources Defense Council, Inc. v. Texaco Refining & Marketing, Inc.*, 2 F.3d 493, 499 (3rd Cir.1993). In *Texaco Refining*, the court ruled that a plaintiff can establish that violations are continuous or imminent "in either of two ways: first, by proving a likelihood of recurring violations of the same parameter; or second, by proving a likelihood that the same inadequately corrected source of trouble will cause recurring violations of one or more different parameters." *Id.* Even if the Court believed that the FCCU catalyst regenerator magnitude reporting violations and the Clause sulfur recovery unit magnitude reporting violations involved two separate parameters (which it does not), the two violations meet the second prong of the *Texaco Refining* test. The

"same inadequately corrected source of trouble," Farmland's reporting methods, account for the violations. Therefore, the Court finds that if Farmland did violate the FCCU catalyst regenerator reporting requirement (an allegation which Farmland disputes above), then such a violation constitutes a continuing violation of 40 C.F.R. §§ 60.7(c) & 60.13(h), requiring that the magnitude of excess emissions be reported to the KDHE.

■ Plaintiffs have clearly set forth adequate evidence, in the form of the 1993–94 uncorrected Clause sulfur recovery unit quarterly reports and the more recent FCCU catalyst regenerator quarterly reports, from which a reasonable fact finder could conclude either that defendant was in fact violating the act at the time plaintiffs filed their complaint or that future violations of the act were imminent. *See Steel Co.*, 118 S.Ct. at 1019. Therefore, the plaintiffs' summary judgment motion related to this issue is granted and Farmland's summary judgment motion related to this issue is denied.

### 4. Count VI: Excess Emission Violations—the coal-fired boiler

■ The fourth standing inquiry is whether plaintiffs have met the redressability standard of showing that a reasonable fact finder could conclude that Farmland's CAA violations relating to the coal-fired boiler were ongoing or imminent at the time suit was filed. For the reasons set forth below, the Court finds that plaintiffs do not have standing on this count.

The coal-fired boiler is subject to the opacity limits set forth in 40 C.F.R. § 60.43b(f), prohibiting the discharge from any coal-fired boiler of gases exhibiting greater than 20% opacity except for one six-minute period per hour of not more than 27% opacity. Many of the facts related to this issue are undisputed. Farmland only operates the coal-fired boiler when cold weather increases its demand for steam. The last time that the coal-fired boiler operated was in March 1998. In the

1st Quarter 1998, the coal-fired boiler exceeded opacity limits on twenty occurrences. During the summer of 1998, Farmland undertook corrective measures to improve emissions from the coal-fired boiler by replacing all emission control bags. Plaintiffs filed suit in November 1998.

In addition to these uncontroverted facts, the parties make the following arguments. Farmland argues that the excess emissions in the 1st Quarter 1998 were the result of malfunctions and the cleaning of the bag house. Under 40 C.F.R. § 60.43b(g), the opacity standards related to coal-fired boilers "apply at all times, except during periods of startup, shutdown, or malfunction." Thus, according to Farmland, it did not violate this portion of the CAA in the 1st Quarter 1998. Farmland also has produced an affidavit from the refinery's environmental superintendent opining that maintenance and "coaching" of the unit operator should "reduce instances of excess opacity." Hanley Aff. ¶ 6(p). Farmland argues that the plaintiffs can produce no evidence that the new emission control bags were ineffective at the time plaintiffs filed suit or that at such time it was imminent that the bags would become so.

In response, plaintiffs first note that Farmland has provided no documentation to support Mr. Hanley's opinion. Plaintiffs also present their own affidavit opining that Farmland should have replaced the emission control bags before excess opacity emissions occurred. Goenner Aff. ¶ 7. Plaintiffs argue that the violations which occurred in the winter immediately prior to the time that plaintiffs filed suit, as well as Farmland's lack of documentation demonstrating that compliance problems have been eradicated, present a reasonable likelihood that Farmland had not completely eliminated the risk of continued violations at the time plaintiffs filed suit.

However, plaintiffs, not Farmland, bear the burden of coming forward with specific

evidence from which a reasonable fact finder could conclude either that Farmland was violating the CAA at the time plaintiffs filed their complaint or that future violations of the CAA were imminent. *See Steel Co.,* 118 S.Ct. at 1019. Plaintiffs must adduce evidence that Farmland's emission control bag repairs were ineffective; Farmland does not have the burden of proving that the repairs are effective (although Farmland has presented the Hanley affidavit opining as much). The only evidence that plaintiffs present is the affidavit of Mr. Goenner opining that Farmland should have replaced the emission control bags sooner. This affidavit does not allege that the repairs were insufficient to prevent emissions violations after the summer of 1998. Nor does Mr. Goenner opine that emissions violations were ongoing or imminent at the time plaintiffs filed suit. Thus, plaintiffs' single piece of evidence is irrelevant to the standing inquiry. Because plaintiffs fail to present adequate evidence from which a reasonable fact finder could conclude that at the time of plaintiffs' complaint the coal-fired boiler was likely to violate the CAA opacity emission standards during future operations, the Court holds that plaintiffs do not have standing to bring Count VI.

### 5. Count IX: Violations of K.A.R. 28–19–202 & 28–19–210(c)(3)(D)

▮ In Count IX, plaintiffs allege that Farmland violated K.A.R. 28–19–202 & 28–19–210(c)(3)(D) by under-reporting air emissions amounts in annual inventory reports filed with the KDHE for 1994–97. As a result of this under-reporting, plaintiffs contend that Farmland underpaid fees to the KDHE in 1994–96. The parties have now filed cross-motions for summary judgment requesting the Court to determine whether plaintiffs have standing to bring these claims. As stated below, the Court holds that plaintiffs have standing on this count.

In disputing the emission amounts filed in the annual inventory reports, plaintiffs compare the annual reports to Farmland's own quarterly reports in which the sulfur dioxide emission amounts reported for the Radco heater are significantly greater. Plaintiffs also rely on Farmland's February 2, 1999 letter to the KDHE in which Farmland conceded that in its annual inventory reports for the years 1993–97 it had failed to include sulfur dioxide emissions during times of emergency release. The letter then proceeds to recalculate the amount of sulfur dioxide emissions from the FCCU catalyst regenerator for those years. Plaintiffs note that Farmland has not corrected the 1993–97 annual inventory reports as they relate to emission sources other than the FCCU catalyst regenerator, such as the Radco heater.[11] Plaintiffs contend that the annual reports with regards to the FCCU catalyst regenerator were not corrected at the time that plaintiffs filed suit, and that the annual reports with regards to other emission sources still have not been corrected. As a result, plaintiffs claim that the violations were ongoing at the time plaintiffs filed, giving them standing.

Farmland responds to plaintiffs' arguments by also relying on its February 1999 letter to the KDHE. Farmland contends that the letter amended the reports filed for 1994–97 by using a new estimation methodology, which Farmland continues to use. Farmland does not specifically address plaintiffs' claims that the letter only amended reports related to the FCCU catalyst regenerator. Providing a letter from the KDHE approving Farmland's new estimation methodology, Farmland asserts that plaintiffs cannot show that Farmland would revert to the old calculation system. Because Farmland allegedly corrected the

---

11. Plaintiffs also argue that Farmland has not revised the annual inventory forms with respect to chemical emissions other than sulfur dioxide and volatile organic compounds, but plaintiffs have presented no evidence that Farmland's original annual reports were defective in this area. Thus, the Court will not address this argument.

1994–97 annual reports and now uses new estimation methodology, Farmland argues that plaintiffs' claims are moot.

■ The Court concludes that genuine issues of material fact exist as to whether Farmland was violating the reporting requirements of K.A.R. 28–19–202 & 28–19–210(c)(3)(D) when plaintiffs filed suit. A plaintiff cannot meet the redressability prong of standing where the defendant has corrected all reporting violations before suit is filed. *See Steel Co.*, 118 S.Ct. at 1009, 1018. However, this rule does not deny plaintiffs standing at the summary judgment stage because plaintiffs have presented evidence that Farmland did not correct its 1994–97 annual reports relating to emission sources other than the FCCU catalyst regenerator. Thus, a reasonable trier of fact could conclude that Farmland's violations were ongoing at the time plaintiffs filed suit. Farmland's evidence that it has since changed its reporting methods applies to the issue of mootness and will be addressed below.

Plaintiffs' second contention under this count is that, based on Farmland's under-reporting of emissions in its originally filed inventory reports, Farmland underpaid fees to the KDHE in 1994–96. In its February 1999 letter to the KDHE, Farmland concedes that under its new calculation method it underpaid fees for those years by approximately $8,700. However, Farmland presents evidence showing that at the time plaintiffs filed suit Farmland owed the KDHE no fees. First, Farmland asserts that it has paid the maximum annual fee for its volatile organic compound (VOC) emissions. Plaintiffs do not dispute this fact. Thus, Farmland cannot possibly owe the KDHE any more in fees for additional VOC emissions in 1994–96. Second, Farmland argues that, as evidenced by its revised calculations in its February 1999 letter to the KDHE, Farmland overpaid its emission fees in 1993 by almost $28,000. Similarly, Farmland overpaid its emissions fees in 1997 by almost $2,000. When the years 1993–97 are viewed together, Farm-land overpaid the KDHE approximately $21,300. The Kansas regulation governing annual emissions fees expressly states that any amount of overpayment "shall be credited to the annual emissions fee for subsequent years." K.A.R. 28–19–202(f). Farmland's overpayment in 1993 exceeded its net under-payments in 1994–96. Plaintiffs' only response to Farmland's arguments is the citation of a New Jersey district court case which held that periods of excess pollution emissions could not be offset by periods when pollution emissions were within standards. *See Public Interest Research Group v. U.S. Metals Refining, Co.*, 681 F.Supp. 237, 246 (D.N.J. 1987). The Court finds that *Public Interest* bears no weight on the claim at bar because it makes no mention of the Kansas regulation, nor does it discuss the payment of fees to a state agency, a conceptually different matter from pollution emissions. Furthermore, plaintiffs present no evidence showing that if they succeed in proving that Farmland is in ongoing violation of the K.A.R. 28–19–202 & 28–19–210(c)(3)(D) reporting requirements that Farmland's "debt" owed to the KDHE will surpass Farmland's current "credit" with the agency.

■ Based on the clear statutory language of K.A.R. 28–19–202(f) and plaintiffs' lack of evidence, the Court concludes that plaintiffs have no standing to bring suit on this allegation. Plaintiffs fail to bring forth facts from which a reasonable fact finder could conclude that Farmland violated the fee provisions of K.A.R. 28–19–202 & 28–19–210(c)(3)(D). Rather, the record gives the appearance that Farmland actually had a credit with the KDHE when plaintiffs filed suit. In sum, the Court holds that plaintiffs have standing to pursue their claim against Farmland for reporting violations under K.A.R. 28–19–202 & 28–19–210(c)(3)(D), but have no standing with regard to the alleged fee violations under K.A.R. 28–19–202 & 28–19–210(c)(3)(D).

### 6. Count X: Violation of 40 C.F.R. § 60.11(d)

Plaintiffs' tenth claim for relief is that Farmland failed to monitor and operate the Coffeyville refinery in a manner consistent with good air pollution control practices as required by 40 C.F.R. § 60.11(d). Subsection (d) requires that "[a]t all times, including periods of startup, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions." Based on the Court's finding that plaintiffs have set forth sufficient evidence of standing on the majority of the above claims of CAA violations, the Court logically concludes that plaintiffs also have standing on this count.

Plaintiffs allege that the Coffeyville refinery suffers from systemic problems related to three areas: 1) malfunctioning and inadequate equipment, 2) employee training deficiencies, and 3) monitoring and reporting deficiencies. Plaintiffs assert that the KDHE recognized these problems in its July 20, 1998 administrative order requiring Farmland to implement an employee-training program and to install a computer program to ensure routine maintenance. These problems result in Farmland's alleged continuous violation of the CAA, as discussed above.

In response, Farmland also makes arguments similar to those made above. First, Farmland contends that the recent improvements to the refinery ensure that it operates in a manner consistent with good air pollution control practice.[12] Second, Farmland contends that recent employee training and the installation of a back-up monitoring system aid in its compliance with 40 C.F.R. § 60.11(d). Finally, Farmland contends that its excess emissions have not violated the CAA, apparently because they take place only during times of startup, shutdown, or malfunction.

The Court finds that plaintiffs have set forth enough evidence to raise genuine issues of material fact regarding the efficiency of Farmland's air pollution control mechanisms. Significantly, Plaintiffs have presented evidence that, both before and after the filing of this suit, Farmland has emitted sulfur dioxide in excess of the limits set forth in the CAA. Farmland cannot assert the malfunction exception to the CAA under this claim because 40 C.F.R. § 60.11(d) applies "[a]t all times, including periods of startup, shutdown, and malfunction." Therefore, plaintiffs have convinced the Court that they have standing on this count.

## III. The Doctrine of Mootness

### A. Applicable Standards

Farmland has also moved for summary judgment on the basis that plaintiffs' claims are moot. The Court has focused its order thus far on the limited issue of whether plaintiffs had standing at the time they filed their suit and, certainly, this threshold inquiry needed resolution. That is not to say, however, that the "requisite personal interest" need only exist at the time plaintiffs filed their suit. To qualify as a case fit for federal-court adjudication, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona,* 520 U.S. 43, 66, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (citations omitted); *accord Geraghty,* 445 U.S. at 397, 100 S.Ct. 1202; *Horstkoetter v. Department of Public Safety,* 159 F.3d 1265, 1276 (10th Cir.1998). This principle is commonly referred to as mootness—a doctrine which prevents "the maintenance of suit when 'there is no reasonable expectation that the wrong will be repeated.'"

---

12. Farmland has made the following improvements: it removed a blockage in the amine scrubbing device, it completed the installation of new electrodes in the FCCU cata- lyst regenerator, it installed a new flue gas cooler, it replaced the bags in the coal-fired bag house, and it installed a third sulfur recovery unit.

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 66, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (quotations omitted).

The mootness doctrine "protects defendants from the maintenance of suit ... based solely on violations wholly unconnected to any present or future wrongdoing, while it also protects plaintiffs from defendants who seek to evade sanction by predictable 'protestations of repentance and reform.'" *Id.* (quoting *United States v. Oregon State Medical Soc'y,* 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952)). Of course, a claim will not necessarily be rendered moot simply because defendant has voluntarily ceased the alleged violation at some point after plaintiffs filed their complaint. *See Steel Co.,* 118 S.Ct. at 1019–20; *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).[13] Rather, a claim will be rendered moot only if defendant can demonstrate that the alleged violation has ceased and that "there is no reasonable expectation that the wrong will be repeated." *W.T. Grant,* 345 U.S. at 633, 73 S.Ct. 894 (citation omitted). This burden is a heavy one. *See Id.; accord Gwaltney,* 484 U.S. at 66–67, 108 S.Ct. 376 (holding that, in seeking to have a case dismissed as moot, "the defendant must demonstrate that it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" (quoting *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968))); *City of Albuquerque v. Browner,* 97 F.3d 415, 420 (10th Cir.1996), *cert. denied,* 522 U.S. 965, 118 S.Ct. 410, 139 L.Ed.2d 314 (1997). In sum, if defendant can demonstrate that any of the alleged violations have ceased after plaintiffs filed their complaint and that there is no reasonable expectation that the violation will be repeated, those claims would be rendered moot.

**B. Discussion**

**1. Count V: Excess Emission Violations—the Radco heater, the Clause sulfur recovery unit, and the FCCU catalyst regenerator**

As set forth above, plaintiffs have established standing for the purpose of the parties' summary judgment motions regarding excess emissions. Thus, the Court must now determine if Farmland has established the absence of genuine issues of material fact as to whether there is a reasonable expectation that the violations will be repeated. Farmland relies on substantially the same arguments and evidence discussed above, that it has made significant improvements to the refinery and that excess emissions subsequent to the filing of the complaint fall under the malfunction exception to the CAA, to establish that it is unlikely to violate the CAA in the future. Similarly, plaintiffs assert the evidence of post-complaint emissions to challenge Farmland's claims. Farmland has not presented enough evidence for the Court to rule conclusively that the malfunction exception applies. Therefore, under the analysis above, plaintiffs have set forth facts showing that genuine issues of material fact remain as to if Farmland is reasonably likely to violate the CAA in the future. This claim is not moot.

**2. Count V: Quarterly Reporting Violations—reporting in pounds rather than in parts per million**

The next question is whether Farmland's correction of prior quarterly reports and its current practice of reporting excess emissions in ppm, rather than in

---

**13.** Moreover, the Court's power to grant injunctive relief "survives discontinuance of the illegal conduct," but the moving party must satisfy the Court that relief is needed because of "some cognizable danger of recurrent violation." *W.T. Grant,* 345 U.S. at 633, 73 S.Ct. 894; *see also Steel Co.,* 118 S.Ct. at 1020 (holding that the presumption of future injury may be applied to refute the assertion of mootness by a defendant who has ceased the complained—of activity after the filing of the complaint).

pounds, moot plaintiffs' claims on this issue. In their complaint, plaintiffs seek both injunctive relief and civil monetary penalties. A claim for injunctive relief becomes moot if, as set forth above, the defendant can demonstrate that any of the alleged violations have ceased after plaintiffs filed their complaint and that there is no reasonable expectation that the violation will be repeated. As discussed under Section II.B.2, Farmland has presented evidence that it corrected all past reports in which it specified the amount of excess emissions in pounds, rather than in ppm. Farmland has also shown that it has changed its reporting policy and has reported its excess emissions in ppm since the 2nd Quarter 1998 report. Plaintiffs do not dispute this evidence. Thus, it is uncontroverted that Farmland has ceased violating this requirement of the CAA subsequent to the filing of plaintiffs' complaint. Furthermore, plaintiffs present no evidence showing that genuine fact issues exist as to whether Farmland will revert to reporting solely in pounds. Plaintiffs' claim for injunctive relief relating to the units of measurement used in Farmland's quarterly reports is therefore moot.

■ However, Farmland's post-complaint compliance does not moot plaintiffs' claim for civil monetary remedies. Although the Tenth Circuit has not addressed this issue, the overwhelming majority of circuits that have encountered the issue have held that even if post-complaint compliance should moot a citizen's claim for injunctive relief, the citizen's claim for civil penalties is not moot. *See Comfort Lake Ass'n, Inc. v. Dresel Contracting Inc.*, 138 F.3d 351, 356 (8th Cir.1998) (holding "even if a polluter's voluntary permanent cessation of the alleged violations moots a citizen suit claim for injunctive relief, it does not moot a related claim for civil penalties"); *Atlantic States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 820 (7th Cir.) (holding "[i]f the violation is cured at some point while the suit is pending, ... the case nevertheless

does not become moot .... [because] civil penalties ... would be recoverable"), *cert. denied*, 522 U.S. 981, 118 S.Ct. 442, 139 L.Ed.2d 379 (1997); *Natural Resources Defense Council, Inc. v. Texaco Ref. & Marketing, Inc.*, 2 F.3d 493, 503 (3d Cir. 1993) (holding "once a citizen plaintiff establishes an ongoing violation of a parameter at the time the complaint is filed, the court is obliged to assess penalties for all proven violations of that parameter"); *Atlantic States Legal Found., Inc. v. Pan Am. Tanning Corp.*, 993 F.2d 1017, 1021 (2d Cir.1993) (holding that "a defendant's ability to show, after suit is filed but before judgment is entered, that it has come into compliance with limits on the discharge of pollutants will not render a citizen suit for civil penalties moot"); *Carr v. Alta Verde Indus. Inc.*, 931 F.2d 1055, 1065 n. 9 (5th Cir.1991) ("Even had the improvements mooted the plaintiffs' action for injunctive relief, it would not necessarily have mooted the plaintiffs' action for civil penalties") (dicta); *Atlantic States Legal Found., Inc. v. Tyson Foods Inc.*, 897 F.2d 1128, 1135 (11th Cir.1990) (holding "the mooting of injunctive relief will not moot the request for civil penalties as long as such penalties were rightfully sought at the time the suit was filed"); *Pawtuxet Cove Marina, Inc. v. Ciba–Geigy Corp.*, 807 F.2d 1089, 1094 (1st Cir.1986) ("A plaintiff who makes allegations warranting injunctive relief in good faith, judged objectively, may recover a penalty judgment for past violations even if the injunction proves unobtainable").

Farmland cites the one case that has taken a contrary position to support its argument that plaintiffs' entire claim should be deemed moot. In *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 149 F.3d 303, 306–07 (4th Cir.1998), *cert. granted*, —— U.S. ——, 119 S.Ct. 1111, 143 L.Ed.2d 107 (1999), the Fourth Circuit held that because the plaintiffs' claims for injunctive and declaratory relief were moot, the plaintiffs' claim for civil penalties was also moot because penalties paid to the United States Treasury

could not redress the plaintiffs' injuries. In reaching this conclusion, the Fourth Circuit relied on the United States Supreme Court's opinion in *Steel Co.,* which held that a citizen lacked standing to bring an action when, before suit was filed, the defendant had fully cured its failure to submit certain reports. *See* 523 U.S. 83, 118 S.Ct. 1003, 1018–19, 140 L.Ed.2d 210 (1998). The *Steel Co.* Court concluded that since the requested civil penalties would be paid to the United States Treasury, rather than to the plaintiff, such penalties would not redress the plaintiffs injury, but would only redress the "undifferentiated public interest" in the faithful execution of the laws. *Id.* at 1018 (citation omitted).

However, the Court concludes that *Steel Co.* does not govern the resolution of this issue based on the logic expounded by Judge Lucero in *Old Timer, Inc. v. Blackhawk–Central City Sanitation Dist.,* 51 F.Supp.2d 1109, 1117 (D.Colo.1999). As in this case, *Old Timer* involved violations of an act which were subsequently corrected after the filing of plaintiff's suit. 51 F.Supp.2d at 1116–17. In holding the plaintiff's claim for penalties not moot, Judge Lucero distinguished *Steel Co.:*

> It is important to note that at the time suit was filed [in *Steel Co.*], there was no ongoing violation of the statute sought to be enforced. Here, in contrast, [the plaintiff] alleged ongoing violations causing direct injuries.... Taking steps taken to ensure the [defendant's] future compliance with its permit and fining the polluter for its recent violations may well ... redress the injury.... Unlike in *Steel Co.,* then, the requested civil penalties do not simply provide [the plaintiff] "psychic satisfaction" by vindicating an "undifferentiated public interest" in enforcing the law, and the claim is not moot.

*Id.* at 1117 (citations omitted). Judge Lucero went on to note that his decision was supported by the Supreme Court's decision in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). He wrote:

> The *Gwaltney* Court remanded the case for determination of a remedy despite its apparent knowledge that the [Clean Water Act] violations had been corrected by subsequent improvements, and that defendant was then in compliance with its permit. Because *Steel Co.* cited *Gwaltney* with approval, without implying that the Court erred in remanding the case despite the defendant's postcomplaint compliance, I conclude that *Steel Co.* does not require dismissal of this case.

*Id.* (citations omitted).

The facts in this case are very similar to those in *Old Timer.* At the time suit was filed, Farmland had not corrected its past reporting violations, thus making the violations continuous.[14] Because the Court agrees with Judge Lucero's opinion, the Court now follows the majority of circuits that have addressed the issue and concludes that the mootness of plaintiffs' claim for injunctive relief does not moot plaintiffs' claim for civil penalties.

### 3. *Count V: Quarterly Reporting Violations—failure to report the magnitude of excess emissions*

 Farmland's next argument is that plaintiffs' claim relating to the magnitude of emissions required to be reported is moot. Under the facts and arguments set forth by the parties under the standing analysis in Section II.B.3, the Court concludes that Farmland has not met its "heavy burden" of demonstrating that its reporting violations relating to the magnitude of emissions have ceased and are not likely to be repeated. Plaintiffs present

---

**14.** The Court deemed Farmland's reporting violations "continuous" under the standing analysis in Section II.B.2.

evidence that since the filing of this lawsuit Farmland has failed to report the magnitude of excess emissions from its FCCU catalyst regenerator. Farmland argues that it reported the magnitude of excess emissions on all days on which it was required to because it was not required to report the magnitude of steam-induced excess emissions. Genuine issues of material fact clearly remain as to whether Farmland's magnitude reporting violations had ceased at the time suit was filed and whether Farmland is likely to violate the CAA in the future. This claim is not moot.

### 4. Count IX: Violations of K.A.R. 28–19–202 & 28–19–210(c)(3)(D)

■ As discussed under Section II.B.5 above, Farmland presents evidence showing that since the filing of this lawsuit it has adopted a new method of reporting sulfur dioxide emissions which complies with the requirements of K.A.R. 28–19–202 & 28–19–210(c)(3)(D). Thus, Farmland argues, injunctive relief accomplishes nothing because Farmland has already amended past reports and has begun to comply with K.A.R. 28–19–202 & 28–19–210(c)(3)(D).[15] However, plaintiffs present evidence that Farmland has not yet amended the 1994–97 annual reports for emission sources other than the FCCU catalyst regenerator. This evidence led the Court to conclude under its standing analysis that genuine issues of material fact exist as to if Farmland's reporting violations are ongoing. The possibility that a reasonable fact finder could conclude that Farmland's violations are ongo-

ing leads to the Court's decision that Farmland has not met its burden on mootness of establishing the absence of genuine issues of material fact as to whether there is a reasonable expectation that the violations will be repeated.[16]

### IV. The Liability Inquiry

Although the Court's March 19, 1999, order contemplated resolving the standing question before proceeding to the issue of liability, plaintiffs move for summary judgment on liability for Count V.[17] Plaintiffs allege that emissions from the Radco heater, FCCU catalyst regenerator, and Clause sulfur recovery unit violate the CAA; and that Farmland has not met the reporting requirements of the CAA. To succeed on this motion, plaintiffs must demonstrate the absence of a genuine issue as to any material fact. Fed.R.Civ.P. 56(c).

■ As set forth above, Farmland has brought forth adequate evidence from which a reasonable fact finder could conclude that it was not violating the CAA at the time suit was filed. First, with regard to plaintiffs' claims that the Radco heater, FCCU catalyst regenerator, and Clause sulfur recovery unit discharged emissions in excess of the limits allowed by the CAA, Farmland has presented some minimal evidence that the excess emissions occurred only during periods of startup, shutdown, or malfunction; and thus do not violate the CAA. That evidence is largely conclusory in that it consists of the unelaborated upon, bare opinion of Mr. Hanley and the reports made to the KDHE which do little more than label the excess emissions as

---

15. The Court notes that even if it finds injunctive relief moot, under the analysis in Section III.B.3 above, the burden is on the defendant to also prove mootness of civil penalties.

16. As discussed above, a claim for injunctive relief becomes moot if the defendant can demonstrate that any of the alleged violations have ceased *and* that there is no reasonable expectation that the violation will be repeated. Plaintiffs' contention that Farmland's violations of K.A.R. 28–19–202 & 28–19–210(c)(3)(D) are ongoing distinguishes this claim of mootness from the claim in Section

III.B.2. There, the Court found plaintiffs' claim moot based partially on the uncontroverted fact that Farmland had corrected all past reports.

17. The Court believes that the question of liability is not yet truly ripe for motion practice in light of its earlier order. Nevertheless, because Farmland did not object to plaintiffs' motion or raise issues under Fed.R.Civ.P. 56(f), the Court will address it here, albeit rather perfunctorily.

**1238**

malfunctions. The Court is reluctant, however, to decide liability at this stage on such a skimpy record, particularly in light of the focus which its prior order placed on standing. On a renewed motion, made at the close of discovery, the Court would anticipate a much more fully developed exposition of the facts underlying Farmland's contention that excess emissions were caused by malfunctions and specifically correlating them to the definition of "malfunction" found in 40 C.F.R. § 60.2. If the evidence does not go beyond what was presented here, and if plaintiffs properly challenge its sufficiency, the outcome may not be the same as it is at this time.

Second, in disputing plaintiffs' allegation that it reported its emissions in the wrong unit of measurement, Farmland has come forth with evidence that it was reporting its excess emissions in ppm, rather than pounds, at the time that plaintiffs filed suit, and that it continues to report in this manner. Farmland has also demonstrated that it submitted corrected emissions reports for the 1996–98 quarters, changing the unit of measurement to ppm. Finally, in response to plaintiffs' claim that it failed to report the magnitude of excess emissions, Farmland has shown that it has reported the magnitude of excess emissions arising from the Clause sulfur recovery unit since 1996. Farmland has also presented evidence that it has not violated the magnitude reporting requirements related to the FCCU catalyst regenerator.

In light of Farmland's evidence, the Court finds that plaintiffs fail to demonstrate the absence of a genuine issue as to any material fact on the issue of whether Farmland was violating the CAA requirements at the time suit was filed. Therefore, the Court concludes that, on the record before it, plaintiffs' motion for summary judgement on liability of Count V should be denied at this time.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' renewed motion for partial summary judgment on standing and Count V (doc # 55) is **granted** in part and **denied** in part, and that

defendant's renewed motion for summary judgment on standing and mootness (doc. # 51) is **granted** in part and **denied** in part.

Specifically, plaintiffs' renewed motion is **granted** with respect to standing on Counts V, IX, and X. Plaintiffs' renewed motion is **denied** with respect to standing for Count VI and with respect to liability on Count V. Defendant's renewed motion is **granted** with respect to standing for Count VI and mootness on the issue of injunctive relief for the Count V quarterly unit-of-measurement reporting violations. Defendant's renewed motion is **denied** with respect to standing on Counts V, IX, and X, with respect to mootness on the Count V claim of excess emissions, with respect to mootness on the issue of civil penalties for the Count V claim of unit-of-measurement reporting violations, with respect to mootness on the Count V claim of magnitude of excess emissions reporting violations, and with respect to mootness on Count IX.

**IT IS SO ORDERED.**